# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NIEVES ROCHA, Individually and :
as the Personal Representative of the :
Estate of OSCAR ROCHA, Deceased, :
                             :
      Plaintiff,           :    Civil Action No.:    14-1136 (RC)
                             :
      v.                 :    Re Document Nos.:   36, 37, 38, 43, 49
                             :
BROWN & GOULD, LLP, :
DANIEL A. BROWN, and :
DAVID M. LIPMAN, P.A., :
                             :
      Defendants.         :

## MEMORANDUM OPINION

**GRANTING B&G DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANT LIPMAN'S MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT; DENYING AS MOOT B&G DEFENDANTS' MOTION TO DISMISS; AND DENYING AS MOOT B&G DEFENDANTS' MOTION TO STRIKE EXPERT OPINIONS**

## I. INTRODUCTION

Plaintiff Nieves Rocha ("Mrs. Rocha"), individually and as the personal representative of the estate of her deceased husband, Oscar Rocha ("Mr. Rocha"), has commenced this action against attorney Daniel Brown, his law firm, Brown & Gould, LLP, and David Lipman, P.A. (collectively, "Defendants") alleging legal malpractice (Count I), breach of fiduciary duty (Count II), and breach of contract (Count III). Mrs. Rocha alleges that Defendants committed malpractice by failing to file her asbestos-related claims, which arose out of her husband's death from complications caused by mesothelioma, in Maryland state court. Defendants instead filed a lawsuit on Mrs. Rocha's behalf in D.C. Superior Court, and the D.C. court ultimately ruled that the claims were time-barred under D.C. Code § 12-311. Relatedly, Mrs. Rocha alleges that

Brown, through his work with the Trial Lawyers Association of Metro Washington, D.C. ("DC-TLA"), erred by failing to get D.C. Code § 12-311 amended in a way that would have made Mrs. Rocha's asbestos-related lawsuit retroactively timely.

Now before the Court is a motion for summary judgment filed by Brown & Gould, LLP and Daniel Brown (collectively, the "B&G Defendants"), as well as a motion for summary judgment filed by Lipman that incorporates the B&G Defendants' motion and adds arguments specific to Lipman's role in the representation. Together, Defendants seek judgment on Mrs. Rocha's legal malpractice claim in Count I by arguing that the claim is barred by both the statute of limitations and the "judgmental immunity" doctrine. Defendants also request judgment in their favor as to the breach of fiduciary duty claim in Count II on the basis that the claim is not separate and distinct from the legal malpractice claim in Count I. Finally, Defendants seek judgment on Count III, which is premised on Brown's legislative activity, on the basis that Mrs. Rocha fails to state any cognizable legal theory entitling her to relief. In response, Mrs. Rocha has filed a cross-motion asking the Court to enter judgment for her on the issue of whether the legal malpractice claim in Count I was timely filed. For the reasons explained below, the Court will grant the B&G Defendants' and Lipman's motions for summary judgment, and the Court will deny Mrs. Rocha's motion.

## II.  FACTUAL BACKGROUND

Upon consideration of the evidentiary record submitted by the parties, the Court finds that the following facts are not in dispute. *See* Fed. R. Civ. P. 56(a).

### A.  Oscar Rocha's History

Oscar Rocha, a Virginia resident, was employed as a carpenter and painter in the Virginia and D.C. area from approximately 1971 through 1984. *See* Omnibus Order, Civ. Act. No. 0838-

09, Jan. 10, 2011 (D.C. Sup. Ct.) ("Omnibus Order"), ECF No. 37-5, Ex. 9 at 21.[1]  During that

time, Mr. Rocha used and came into contact with asbestos and asbestos-containing products.  *See*

*id*. at 21-22.  On February 22, 2006, Mr. Rocha was diagnosed with mesothelioma, which is a

cancer commonly associated with exposure to asbestos, *see* Surgical Report, ECF No. 37-8, Ex.

25, and Mr. Rocha was informed of this diagnosis on February 28, 2006, *see* Pathology Report,

ECF No. 37-8, Ex. 26.  Mr. Rocha died from complications related to his illness on February 10,

2008.  *See* Death Certificate, ECF No. 37-9, Ex. 27; Omnibus Order, Ex. 9 at 22.

## B.  Brown & Gould's Initial Conversations With Mrs. Rocha

Mrs. Rocha first spoke to Brown and his associates by telephone on February 9, 2009.

*See* N. Rocha Dep., ECF No. 37-1, Ex. 1 at 26:20-27:17; Lawson-Hue Dep., ECF No. 37-3, Ex.

5 at 16:1-10.  Because Mr. Rocha was diagnosed with mesothelioma on February 22, 2006, and

died on February 10, 2008, Brown initially determined that the one-year limitations period in

D.C. Code § 12-311 likely would expire on February 10, 2009, and the limitations period for a

survival action in Maryland likely would expire twelve days later.  *See* Brown Aff., ECF No. 37-

10, at ¶¶ 8-10.  Medical records later indicated that Mr. Rocha was not informed of his diagnosis

until February 28, 2006, which may have extended the Maryland limitations period by six days,

but Brown did not have this information in February 2009.  *See id*. ¶ 10.

During the initial telephone call on February 9, 2009, Mrs. Rocha provided Brown with

information regarding Mr. Rocha's work history.  In particular, she informed Brown that Mr.

Rocha had worked for many years as a carpenter, drywall worker, and independent painter; that

he had worked at the Skyline Towers apartment complex in Virginia when it collapsed in 1973;

---

[1]        In addition to having the Omnibus Order as part of the summary judgment
evidentiary record, the Court "may take judicial notice of public records from other court
proceedings." *Lewis v. DEA*, 777 F. Supp. 2d 151, 159 (D.D.C. 2011).

and that he had performed painting work at the D.C. Greyhound Bus terminal, where he may have been exposed to asbestos or asbestos-containing insulation. *See* Client Intake Form, ECF No. 37-9, Ex. 28; N. Rocha Dep. at 29:1-33:15; *see also* Brown Dep., ECF No. 37-2, Ex. 3 at 60:10-17, 98:22-99:10.

Mrs. Rocha and her son, Michael, met with Brown in-person the next day, February 10, 2009. Given the imminent potential limitations deadlines, Brown informed the Rochas that it was imperative to locate any witnesses or evidence that might provide information regarding where Mr. Rocha was exposed to asbestos. *See* Brown Aff. ¶ 11. At this meeting, the Rochas did not advise Brown that Mr. Rocha had performed work in Maryland that might have exposed him to asbestos. *See id.*; Interview Notes, ECF No. 37-9, Ex. 29. Also at this meeting, Brown gave Mrs. Rocha a client intake questionnaire to fill out. *See* N. Rocha Dep. at 34:5-35:12; Client Questionnaire, ECF No. 37-9, Ex. 31. Mrs. Rocha's responses to the questionnaire did not indicate any potential connection between Mr. Rocha and asbestos exposure in Maryland, nor did Mrs. Rocha indicate that she had knowledge of a witness who might possess such information about Mr. Rocha's potential exposure in Maryland. *See* Client Questionnaire, Ex. 31; *see also* N. Rocha Dep. at 33:18-36:12, 39:6-40:17, 43:16-44:5; Brown Dep. at 50:3-51:18; Brown Aff. ¶ 11.

In her answers to the questionnaire, Mrs. Rocha provided the contact information for her eldest son, John, but neither Mrs. Rocha nor Michael Rocha told Brown in 2009 that John might possess information regarding Mr. Rocha's work history, including whether Mr. Rocha may have been exposed to asbestos in Maryland. *See* Client Questionnaire, Ex. 31; Brown Dep. at 106:8-107:22; Brown Aff. ¶ 11.[2] Brown attempted to contact John Rocha by telephone in

_____

[2]     Mrs. Rocha disputes this fact on the basis that she has since "testified that her son,

February 2009, and Brown left a message when John did not answer.  *See* Brown Dep. at 78:9-11.  When John Rocha called back, he did not indicate in his message for Brown that he had information regarding Mr. Rocha's work history, and Brown and John ultimately did not talk directly in February 2009.  *See* J. Rocha Dep., ECF No. 37-3, Ex. 4 at 26:12-27:16.  As of February 28, 2009, Brown had no evidence that Mr. Rocha was exposed to asbestos while working in Maryland.[3]  *See* Brown Dep. at 115:2-9; Brown Aff. ¶ 17.  Brown did, however, have evidence that Mr. Rocha likely was exposed to asbestos while working in Virginia and D.C.  *See* Brown Dep. at 60:10-17, 98:22-99:10; Brown Aff. ¶ 18.

During his deposition on October 6, 2014, as part of this litigation, John Rocha testified as to certain recollections about his father's potential work history in Maryland.  In particular, John recalled that around five- or six-years of age (*i.e.*, between October 1975 and October 1976), he had accompanied his father on one occasion from Virginia across the Woodrow Wilson Bridge, and he thought they may have gone to a jobsite in Prince George's County, Maryland, where Mr. Rocha may have performed mudding, drywall work, and painting.  *See* J. Rocha Dep. at 47:16-49:23, 59:17-62:18, 77:6-14; Brown Aff. ¶ 13.  This deposition testimony

---

John Rocha, recalled the products that Oscar Rocha used."  Pl.'s Stmt. Facts in Dispute, ECF No. 43-1, at ¶ 55.  But Mrs. Rocha's deposition testimony in this litigation on September 30, 2014, does not contradict Brown's evidence regarding what she told him and what he knew *in 2009*.

[3]     Mrs. Rocha disputes this fact on the basis that she and Michael Rocha allegedly "told Brown" that they "knew" Mr. Rocha had worked "throughout the D.C. Metropolitan Area" during his career.  *See* Pl.'s Stmt. Facts in Dispute ¶ 69 (quoting M. Rocha Dep., ECF No. 37-1, Ex. 2 at 81).  But the evidence that Mrs. Rocha cites does not support the claim in her statement of facts in dispute.  Specifically, Michael Rocha merely testified at his deposition that they "believe[d]" Mr. Rocha had worked "throughout the D.C. Metropolitan Area"; Michael did not testify, however, that he or Mrs. Rocha *told* Brown this information in or around *February 2009*, or at any other time prior to the deposition.  *See* M. Rocha Dep. at 81:4-7.  Mrs. Rocha's objection therefore misconstrues the evidence on which it relies and does not contradict Defendants' evidence.

remains the only direct evidence that Mr. Rocha may have been exposed to asbestos in

Maryland.  *See* Enslein Email, Sept. 15, 2014, ECF No. 37-9, Ex. 32.

### C.  The First Retainer Agreement

On February 10, 2009, Mrs. Rocha signed a written retainer agreement with Brown &

Gould and the Lipman Law Firm (the "First Retainer").  *See* First Retainer, ECF No. 37-5, Ex. 7.

The First Retainer provided, in relevant part:

> I, Nieves R. Rocha, hereby employ the Law Offices of Brown & Gould, LLP and
> The Lipman Law Firm … as legal counsel to represent me, individually and as
> Executrix/Personal Representative of the Estate of Oscar Rocha, in connection
> with all claims which I may have for damages which were sustained as a result of
> injuries due to Oscar Rocha's exposure to asbestos.  I understand that by this
> Agreement you do not agree to appeal this case should it be necessary.  Such
> representation, if necessary, may be agreed upon at a later date.

*Id.*  The First Retainer further stated that Mrs. Rocha "agree[d] that [the] Law Offices of Brown

& Gould, LLP and The Lipman Law Firm have made no promises or guarantees regarding the

outcome of this claim[,]" and that Mrs. Rocha had "read the above provisions and agree[d] that

they constitute the entire agreement between the parties."  *Id.*

At her deposition, Mrs. Rocha testified as to the following regarding her understanding of

the First Retainer:

> Q.  Did you understand [when you signed the First Retainer] that you were not hiring Mr.
>      Brown to handle any appeal at that time?
> A.  Because we don't know if we're going to have an appeal.
> ….
> Q.  Right.  And so again to answer my question, you were not hiring him at that time to
>      handle an appeal; is that right?
> A.  No.  No.  We just handled to get the case, the asbestos case.
> Q.  Okay.  The trial?
> A.  The trial.

N. Rocha Dep. at 78:18-79:10.  The First Retainer does not provide that Brown & Gould or the

Lipman Law Firm would undertake any legislative services on Mrs. Rocha's behalf.  *See* First

Retainer, Ex. 7.

### D.  Brown's Legislative Activity With The DC-TLA

On February 16, 2009, Brown wrote a letter to the DC-TLA in regard to the group

potentially seeking a legislative clarification about the application of the statute of limitations in

D.C. Code § 12-311, which deals with asbestos-related claims.[4]  *See* Brown Letter, Feb. 16,

2009, ECF No. 37-9, Ex. 37; Brown Dep. at 108:7-110:7.  Brown did not receive a response to

his letter.  *See* Brown Dep. at 110:4-7.  On June 8, 2010, after learning that another DC-TLA

legislative committee meeting was convening, Brown wrote to the DC-TLA for a second time,

and he included with his letter a memorandum discussing what he viewed as ambiguity in § 12-

311.  *See id.* at 144:15-145:3, 147:4-6; Brown Letter, June 8, 2010, ECF No. 37-9, Ex. 38.

Brown also proposed new language for amending the statute, and Brown hoped this language

would clarify that the legislative intent of D.C. Code § 12-311 was to expand the time within

which asbestos claims could be brought, not to shorten the time otherwise available under the

District's three-year limitations period in D.C. Code § 12-301(8).  *See* Brown Dep. at 149:3-10.

Specifically, Brown proposed a new "subsection (d)" for § 12-311 that provided: "This section

shall not be applied to shorten the time period otherwise available to an asbestos-injured plaintiff

under D.C. Code [§] 12-301(8) or D.C. Code [§] 16-2702."  Brown Letter, June 8, 2010, Ex. 38.

Brown's proposal did not include a provision stating that the amended statute would apply

retroactively.  *See id.*

The DC-TLA took up the limitations issue as a legislative priority, and the D.C. Council

took two interim clarifying steps before ultimately passing a final amended statute.  First, the

---

[4]      Mrs. Rocha contends that Brown told her at their initial meeting on February 9, 2009, that he already had been working on achieving legislative change, though it is not clear what legislative activity Brown had engaged in before the February 16, 2009, letter.  *See* Pl.'s Resp. to Interrog. 11, Ex. 34.

D.C. Council adopted an emergency resolution intended to clarify the original legislative intent

of the statute.  Specifically, Resolution 18-642, which was dated October 5, 2010, and entitled

"Asbestos Statute of Limitations Clarification Emergency Declaration Resolution of 2010,"

provided that the intent of D.C. Code § 12-311 was to "expand the period of time in which

plaintiffs may sue to recover for asbestos injuries."  Resolution 18-642, ECF No. 37-9, Ex. 39.

Second, on October 20, 2010, the D.C. Council passed an emergency act, D.C. Act 18-585,

which was entitled "Asbestos Statute of Limitations Clarification Emergency Act of 2010."  D.C.

Act 18-585, ECF No. 37-9, Ex. 40.  The emergency act's stated purpose was to clarify, on an

emergency basis, that § 12-311 was "not intended to shorten pre-existing statutes of limitations

available in any civil action for injury or illness based upon exposure to asbestos."  *Id*.  To

achieve this, the emergency act added a "subsection (d)" to § 12-311 that provided: "A plaintiff

in an asbestos-injury action shall have the longer of the [one-year] limitation period prescribed

by subsection (a) … or the [three-year] limitation period prescribed by § 12-301(8)."  *Id*.  The

language in the emergency resolution and the emergency act differed slightly from the language

proposed by Brown.  *See* Amato Dep., ECF No. 37-4, Ex. 6 at 104:15-105:21; Brown Letter,

June 8, 2010, Ex. 38.

     Following this emergency legislative activity in October 2010, the final legislative

process occurred, and an amended statute was codified in June 2011 with language slightly

different from the emergency act.  The amended version of D.C. Code § 12-311 provides:

(a)  In any civil action for injury or illness based upon exposure to asbestos, the time for
the commencement of the action shall be the later of the following:

(1)  Within one year after the date the plaintiff first suffered disability;

(2)  Within one year after the date the plaintiff either knew, or through the exercise
of reasonable diligence should have known, that the disability was caused or
contributed to by the exposure; or

(3)   Three years from the time the right to maintain the action accrues.

D.C. Code § 12-311 (June 3, 2011).

### E.  The Virginia State Court Litigation

With evidence of Mr. Rocha's likely asbestos exposure in Virginia, Brown decided to pursue a "back-up" case in Virginia state court on Mrs. Rocha's behalf.  *See* Brown Dep. at 67:3-18, 112:9-13; Brown Aff. ¶ 33.  In making the decision to file in Virginia, Brown considered the fact that Virginia procedural rules allowed for "sleeper suits" and nonsuits, which were unavailable in D.C.  *See* Brown Dep. at 112:9-13; Brown Aff. ¶¶ 33-34.  Thus, on February 10, 2010, Brown, through Virginia lawyer Erin Jewell, filed a wrongful death lawsuit in the Circuit Court for Newport News.  *See* Compl. Civ. Act. No. 10-00316TF (Cir. Ct. Newport News, Va. Feb. 10, 2010), ECF No. 43-9, Ex. 7.  On January 12, 2011, Brown instructed Jewell to nonsuit the Virginia action, *see* Brown Email, Jan. 12, 2011, ECF No. 44-8, Ex. 18, and on January 31, 2011, the Virginia court entered the order of nonsuit dismissing the case, *see* Order of Nonsuit, Civ. Act. No. 10-00316TF (Cir. Ct. Newport News, Va. Jan. 31, 2011), ECF No. 45-7, Ex. 27.

### F.  The D.C. Superior Court Litigation

On February 10, 2009, the same day that Mrs. Rocha signed the First Retainer, Brown & Gould filed a wrongful death and survival complaint on her behalf in the D.C. Superior Court against Bondex International, Inc., Georgia-Pacific Corporation, Union Carbide Corporation, and seven other companies.  *See* Compl., Civ. Act. No. 0838-09 (D.C. Sup. Ct. Feb. 10, 2009), ECF No. 37-5, Ex. 8.  As of December 2010, only Bondex, Georgia-Pacific, and Union Carbide remained as defendants in the case because the other defendants had been dismissed through unopposed summary judgment motions.  *See* Dkt., Civ. Act. No. 0838-09 (D.C. Sup. Ct.), ECF No. 46-5, Ex. 35.  At a pre-trial hearing on December 21, 2010, the Superior Court granted

summary judgment for Georgia-Pacific and Union Carbide based on the court's interpretation of D.C. Code § 12-311.  *See* N. Rocha Dep. at 80:19-81:15; Brown Dep. at 175:12-22.  Bondex had not filed a dispositive motion, and it therefore remained as the sole defendant in the case.

On January 10, 2011, the Superior Court issued an Omnibus Order explaining the summary judgment decision.  *See generally* Omnibus Order, Ex. 9.  In particular, the court found that the language in the pre-June 3, 2011, version of D.C. Code § 12-311 was "clear and unambiguous" such that the statute's one-year limitations period applied to Mrs. Rocha's mesothelioma claims and did not give her the option of relying on the three-year limitations period in § 12-301(8).  *See id*. at 29.  The court therefore determined that because "the disability and discovery dates … [were] on or before February 28, 2006, when Mr. Rocha was diagnosed with mesothelioma and no longer able to work," Mrs. Rocha "had one year from that date in which to sue" under § 12-311; accordingly, her February 10, 2009, complaint in D.C. Superior Court was time-barred.  *See id*. at 32.  Finally, looking to the recent emergency legislative activity, the court found no language in Resolution 18-642 or D.C. Act 18-585 indicating that the legislature intended for § 12-311 to apply retroactively to a complaint that was filed prior to the amendment and that had expired by the time of filing, which was the status of Mrs. Rocha's D.C. lawsuit.  *See id*. at 32-34.

On February 4, 2011, Brown & Gould filed a notice of appeal in the D.C. Court of Appeals.  *See* Notice of Appeal, ECF No. 37-5, Ex. 10.  On March 24, 2011, the D.C. Court of Appeals dismissed Mrs. Rocha's appeal without prejudice because the trial court had not yet entered a final judgment as to all defendants.  *See* Dismissal Notice, ECF No. 37-5, Ex. 11.  On April 22, 2011, Brown & Gould filed a consent motion to reinstate the Superior Court action and for the entry of a final order dismissing the last defendant, Bondex.  *See* Consent Mot., ECF No.

37-5, Ex. 12.  The Superior Court entered a corrected final order effecting the full dismissal of the lawsuit on April 26, 2011.  *See* Final Order, ECF No. 37-5, Ex. 13.

### G.  The Relationship Between Mrs. Rocha and Defendants Following The Omnibus Order

Following the Omnibus Order, Mrs. Rocha, Michael Rocha, and Brown engaged in numerous conversations regarding potential terms and conditions by which Defendants might represent Mrs. Rocha during an appeal to the D.C. Court of Appeals.[5]  *See, e.g.*, M. Rocha Dep. at 135:19-136:3.  For example, in a letter dated March 4, 2011, Brown explained to Mrs. Rocha that the First Retainer "does not contemplate that we will appeal the case," and Brown therefore proposed a new retainer based on a contingency fee arrangement and with the option of "retaining an appellate specialist" from another law firm at a flat rate of $45,000 to assist Defendants.  *See* Brown Letter, Mar. 4, 2011, ECF No. 37-5, Ex. 14.  Mrs. Rocha declined Brown's offer to sign a new retainer for the appeal at this time, in part due to the expected costs under Brown's proposal.  *See* N. Rocha Dep. at 84:12-85:13, 87:6-10; M. Rocha Dep. at 128:20-130:18.

After the March 4 letter, Brown attempted to communicate with Mrs. Rocha and her son throughout April and May regarding whether Mrs. Rocha would sign a new retainer for the appeal, but the Rochas mostly ignored Brown's many phone messages, emails, and letters:

---

[5]     Mrs. Rocha asserts that she "disputes the factual recitations" provided by Defendants regarding these conversations following the dismissal of the Superior Court case. *See* Pl.'s Stmt. Facts in Dispute ¶¶ 19-32.  Mrs. Rocha, however, provides no *evidence* creating a dispute of *fact* as to these paragraphs; instead, she merely disagrees with any *legal* characterizations made by Defendants in their statement of facts.  The Court therefore may treat the underlying facts as conceded.  *See Jankovic v. Int'l Crisis Grp.*, No. CV 04-1198, 2014 WL 5581321, at *2 (D.D.C. Nov. 4, 2014) ("[L]egal arguments alone are insufficient to create a factual dispute to defeat a motion for summary judgment."); *Slate v. ABC*, 941 F. Supp. 2d 27, 29 n.3 (D.D.C. 2013) (treating facts in defendant's statement of facts as conceded "in light of the plaintiff's failure to controvert the fact[s] with record evidence").

Letter dated April 12, 2011: "David [Lipman] and I find ourselves hamstrung by our inability to communicate with our client, Nieves.  Numerous phone messages have gone unreturned on the home machine and to each of your cell phones over the last few weeks. We have tried to schedule conversations and have been unsuccessful."  Brown Letter, Apr. 12, 2011, ECF No. 37-5, Ex. 15.

Letter dated April 29, 2011: "I have left, this week, additional phone messages for you and Michael.  I also sent an email to Michael on Tuesday asking to speak with you on Wednesday or Thursday.  None of my messages were returned…. [T]his gives us pause in continuing in our representation."  Brown Letter, Apr. 29, 2011, ECF No. 37-5, Ex. 16.

Letter dated May 6, 2011: "It is *extremely important* that we speak….  Again, the *deadline to file the appeal is approaching*."  Brown Letter, May 6, 2011, ECF No. 37-6, Ex. 17.

Letter dated May 12, 2011: "I am not sure what more I can do in order to try and have a conversation with you about the need for you to decide how you wish to proceed with the appeal of your case — if at all.  Despite my hand-delivered letter to you, dated April 29, 2011, my telephone call to you on May 5, 2011, and my letter to you dated May 6, 2011 delivered via FedEx, I cannot get you to call me or communicate in any way, and I have concerns about the upcoming deadline." Brown Letter, May 12, 2011, ECF No. 37-8, Ex. 18.

Letter dated May 20, 2011: "Based upon our telephone conversation earlier today, it appears that we have reached an impasse in our ability to communicate with you regarding what direction, if any, you wish us to take relative to the impending deadline….  However, you indicated in our telephone conversation today that you are presently unwilling to enter into the Retainer Agreement."  Brown Letter, May 20, 2011, ECF No. 37-8, Ex. 19.

Consistent with Mrs. Rocha's rejection of Brown's March 4 proposal, one issue delaying the signing of a new retainer was concern by Mrs. Rocha and her son about the fees and costs incurred under the First Retainer, as well as the potential costs of Defendants' representation during the appeal.  *See* M. Rocha Dep. at 128:20-130:18.  Mrs. Rocha therefore would not sign a new retainer until these concerns about past and future costs were resolved.  *See id.* at 133:10-134:6.  In addition, Mrs. Rocha demanded that any new retainer must grant her the right to pre-approve expenses going forward, *see id.* at 136:4-137:15, and the Rochas also expressed

concerns about Defendants' substantive handling of the D.C. and Virginia actions, *see id.*

146:14-147:22.

During this period after the dismissal of the Superior Court litigation, Mrs. Rocha and her

son considered alternatives to signing a new retainer with Defendants, including whether they

should obtain new counsel for the appeal or proceed *pro se*.  *See id.* at 139:5-140:22, 142:18-

144:22.  Mrs. Rocha's actions between March and early May 2011 left Brown uncertain about

whether she would sign a new agreement retaining his firm for the appeal:

> Letter dated April 29, 2011: "You need to decide whether you intend to appeal the
> judgment entered in your case and, if so, who you wish to handle the appeal and under
> what terms."  Brown Letter, Apr. 29, 2011, Ex. 16.
>
> Letter dated May 6, 2011: "Please confirm whether you agree with the recommendations
> we have provided to you on how to proceed with the appeal of your case.  If so, we will
> promptly send out a new engagement letter for your signature and on receipt of same, we
> will file the appeal on your behalf."  Brown Letter, May 6, 2011, Ex. 17.
>
> Letter dated May 12, 2011: "Should you wish that we proceed on your behalf, please find
> enclosed a retainer agreement for your signature…. Please let us know as soon as
> possible how you intend to proceed.  In the event you wish to retain us, we must receive
> the signed Retainer Agreement no later than May 23, 2011."  Brown Letter, May 12,
> 2011, Ex. 18.

Thus, on May 20, 2011, with Mrs. Rocha still having not signed a new retainer, Brown sent her a

letter stating that "[t]his concludes our representation of you at the trial level in this matter [but]

please keep in mind that we stand ready, willing, and able to proceed with the appeal of [the

Superior Court] order if you wish us to do so."  Brown Letter, May 20, 2011, Ex. 19.

On May 23, 2011, Brown held a two-hour telephone conference with Mrs. Rocha and

Michael Rocha, and Brown gave them until 5:00 PM that night to decide whether to sign the

proposed retainer for the appeal.  *See* Brown Letter, May 23, 2011, ECF No. 37-8, Ex. 20.  As of

this date, Mrs. Rocha remained interested in pursuing the appeal *pro se* or hiring new counsel,

and Brown mailed the Rochas the relevant trial court paperwork in the event that they decided to file a notice of appeal on their own.  *See id.*; M. Rocha Dep. at 157:3-13.

### H.  The Second Retainer Agreement And The Second Notice of Appeal

At 4:50 PM on May 23, 2011, Michael Rocha emailed Brown to inform him that Mrs. Rocha would sign a new retainer for Defendants to represent her during the appeal before the D.C. Court of Appeals (the "Second Retainer").  *See* M. Rocha Email, ECF No. 37-8, Ex. 21. The Second Retainer differed from the First Retainer in that it changed the compensation format to a contingency fee agreement based on the total amount recovered in the case.  *See* Second Retainer, ECF No. 37-8, Ex. 22.  The next day, May 24, a Brown & Gould attorney filed a second notice of appeal at the D.C. Superior Court on Mrs. Rocha's behalf.  *See* Dkt., Civ. Act. No. 0838-09 (D.C. Sup. Ct.).

### I.  Defendants' Withdrawal From The Second Representation

On June 9, 2011, Brown sent a letter to Mrs. Rocha stating that Defendants would no longer represent her in the appeal due to "breakdowns in … communications" and a "lack of cooperation."  *See* Brown Letter, June 9, 2011, ECF No. 37-8, Ex. 23.  Between the signing of the Second Retainer on May 23 and Brown's letter on June 9, the only service provided by Defendants was filing the second notice of appeal on May 24.  *See* Brown Aff. ¶ 44.

On June 10, 2011, Brown & Gould filed a motion to withdraw in the D.C. Court of Appeals.  *See* Mot. Withdraw, Case No. 11-CV-651 (D.C. Ct. App.), ECF No. 45-8, Ex. 28.  The Court of Appeals entered an order granting the motion to withdraw on June 28, 2011.  *See* Order, June 28, 2011, ECF No. 37-8, Ex. 24.  After the withdrawal, Mrs. Rocha retained a new law firm

to represent her, and this firm handled all substantive aspects of the appeal, including briefing and oral argument.[6]   *See* Brown Aff. ¶ 44; N. Rocha Dep. at 103:9-18.

### J.  The Role Of David Lipman

David Lipman funded the advertisement that first led Mrs. Rocha to contact Brown & Gould about her husband's death.  *See* M. Rocha Dep. at 174:21-22; *see also* 2d Am. Compl., ECF No. 40, at ¶¶ 19-20.  Lipman was a party to the First and Second Retainers, *see* First Retainer, Ex. 7; Second Retainer, Ex. 22, and his role during the Superior Court matter included financing the litigation, being available to Brown as a consultant, and assisting Brown if the case went to trial.  *See* Brown Dep. at 95:1-8.

Lipman was not present at the February 10, 2009, meeting between Mrs. Rocha and Brown.  *See* N. Rocha Dep. at 139:15-140:18; M. Rocha Dep. at 173:19-175:4; Lipman Dep., ECF No. 38-3, Ex. 3 at 7:18-8:8.  Instead, Lipman first spoke with Mrs. Rocha in late 2010.  *See* N. Rocha Dep. at 139:15-140:18; Lipman Dep. at 16:4-6.  Lipman did not promise to perform any legislative work on Mrs. Rocha's behalf, nor did Lipman voluntarily engage in such activity. *See* Lipman Stmt. Facts, ECF No. 38-1, at ¶ 4.[7]

### K.  Plaintiff's Present Lawsuit And The Pending Motions

On June 9, 2014, Mrs. Rocha filed a Complaint against Defendants in D.C. Superior Court, and she filed a nearly identical First Amended Complaint with the Superior Court on June 22, 2014.  On July 3, 2014, the B&G Defendants removed the action to this Court.  *See* Notice of

---

[6]     The Superior Court's statute of limitations ruling ultimately was affirmed on appeal by the D.C. Court of Appeals.  *See* 2d Am. Compl. ¶ 3.

[7]     Mrs. Rocha did not respond to Lipman's statement of material facts.  The Court therefore may treat those facts as conceded.  *See DeMartino v. FBI*, 511 F. Supp. 2d 146, 151 (D.D.C. 2007); *see also* LCvR 7(h) (authorizing the court to treat the movant's statement of material facts as conceded if the non-moving party does not contest those facts).

Removal, ECF No. 1.  On January 9, 2015, Mrs. Rocha filed a Second Amended Complaint asserting three counts against Defendants: legal malpractice in Count I, breach of fiduciary duty in Count II, and breach of contract in Count III based on "express promises to Mrs. Rocha that [Defendants] would get the District of Columbia statute of limitations changed to make her claim timely there[.]"  *See* 2d Am. Compl. ¶ 132.

Now before the Court are the following dispositive motions: (1) the B&G Defendants' motion for summary judgment as to all counts, *see* B&G Defs.' Mem. Supp. Mot. Summ. J., ECF No. 37;[8] (2) Lipman's motion for summary judgment, which incorporates the B&G Defendants' motion and asserts additional arguments specific to Lipman's role in the representation, *see* Lipman's Mem. Supp. Mot. Summ. J., ECF No. 38-2; and (3) Mrs. Rocha's cross-motion for partial summary judgment on the issue of whether the legal malpractice claim in Count I was timely filed, *see* Pl.'s Mem. Supp. Mot. Summ. J., ECF No. 43.

### III.  LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment may be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty*

---

[8]      Through their motion for summary judgment, the B&G Defendants incorporate by reference the arguments made in several other filings, including their (1) motion for partial judgment on the pleadings, *see* ECF No. 22; (2) opposition to Mrs. Rocha's motion for leave to file an amended complaint, *see* ECF No. 26; (3) motion to strike new arguments raised in Mrs. Rocha's reply brief, *see* ECF No. 28; (4) memorandum in support of the motion to quash Mrs. Rocha's subpoena to Christine Figueras, *see* ECF No. 33; and (5) motion to strike the expert opinions of John Amato, IV, *see* ECF No. 36.  The B&G Defendants also filed a motion to dismiss or, alternatively, for summary judgment as to the Second Amended Complaint.  *See* ECF No. 49.  This motion simply incorporates the B&G Defendants' prior arguments regarding the legislative activity claim.  Because the Court ultimately grants summary judgment for Defendants on all counts, the Court denies this motion as moot.

*Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir.

2006).  A fact is "material" if it is capable of affecting the substantive outcome of the litigation.

*See Liberty Lobby*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895.  A dispute is "genuine" if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *See Scott*

*v. Harris*, 550 U.S. 372, 380 (2007); *Holcomb*, 433 F.3d at 895.  When Rule 56 is invoked, the

moving party has the initial burden of demonstrating the absence of a genuine dispute as to any

material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  When the moving party

does not bear the burden of persuasion at trial, its burden "may be discharged by 'showing' —

that is, pointing out to the district court — that there is an absence of evidence to support the

nonmoving party's case."  *Id*. at 325.

  Once the moving party has met its burden, the nonmoving party, to defeat the motion,

must designate "specific facts showing that there is a genuine issue for trial."  *Id*. at 324.  Though

courts must view this evidence in the light most favorable to the nonmoving party and draw all

reasonable inferences in that party's favor, *see Grosdidier v. Broad. Bd. of Governors,*

*Chairman*, 709 F.3d 19, 23-24 (D.C. Cir. 2013), the nonmoving party must show more than

"[t]he mere existence of a scintilla of evidence in support of" his position — "there must be

evidence on which the jury could reasonably find for [the nonmoving party]."  *Anderson*, 477

U.S. at 252.  The nonmoving party, moreover, "may not rest upon mere allegation or denials of

his pleading but must present affirmative evidence showing a genuine issue for trial."

*Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987) (internal citation and quotation

marks omitted).

  Finally, this Court has supplemented Rule 56 with Local Civil Rule 7(h), pursuant to

which a party filing a motion for summary judgment must include a statement of material facts

as to which that party contends there is no genuine dispute. *See also Herbert v. Architect of Capitol*, 766 F. Supp. 2d 59, 63-64 (D.D.C. 2011). "The party opposing the motion must, in turn, submit a statement enumerating all material facts which the party contends are genuinely disputed." *Id*. at 63 (citing LCvR 7(h)(1)). This local rule "places the burden on the parties and their counsel, who are most familiar with the litigation and the record, to crystallize for the district court the material facts and relevant portions of the record." *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 151 (D.C. Cir. 1996). Accordingly, "evidence laying dormant in the record is not enough, for the district court is not obliged to sift through hundreds of pages of depositions, affidavits, and interrogatories in order to make [its] own analysis and determination of what may, or may not, be a genuine issue of material disputed fact." *Potter v. District of Columbia*, 558 F.3d 542, 550 (D.C. Cir. 2009) (quotation marks omitted).

## IV.  ANALYSIS

Mrs. Rocha brings claims against Defendants under D.C. law for legal malpractice (Count I), breach of fiduciary duty (Count II), and breach of contract (Count III).[9] Defendants jointly move for summary judgment as to all of these counts, including Mrs. Rocha's various theories of liability for her legislative activity claim in Count III.[10] Mrs. Rocha, on the other hand, moves for summary judgment on the question of whether the legal malpractice claim in

---

[9]     The parties agree that the Court must apply D.C. substantive law to Mrs. Rocha's claims. *See Burke v. Air Serv Int'l, Inc.*, 685 F.3d 1102, 1107 (D.C. Cir. 2012). The Court's task when sitting in diversity under such circumstances is "to achieve the same outcome [that] would result if the District of Columbia Court of Appeals considered this case." *Metz v. BAE Sys. Tech. Solutions & Servs. Inc.*, 774 F.3d 18, 21-22 (D.C. Cir. 2014) (quotation marks omitted).

[10]     Because Lipman joins the B&G Defendants' motion for summary judgment, the Court refers to "Defendants" collectively, except when making a distinction is necessary.

Count I was timely filed.  Upon consideration of the parties' motions, the memoranda in support thereof and opposition thereto, and the evidentiary record submitted by the parties, the Court will rule as follows.

First, the Court grants judgment for Defendants as to Count I on the basis that, under the "continuous representation" rule, Mrs. Rocha's legal malpractice claim is time-barred by the limitations period in D.C. Code § 12-301(8).  Second, and alternatively, the Court concludes that judgment for Defendants as to Count I also is appropriate because the legal malpractice claim fails on the merits due to the "judgmental immunity" doctrine and the lack of proximate cause.  Third, the Court grants judgment for Defendants as to Count II on the basis that the breach of fiduciary duty claim is not separate and distinct from the failed legal malpractice claim in Count I.  And fourth, the Court grants judgment for Defendants as to Count III on the basis that Mrs. Rocha fails to state any cognizable theory of liability for the legislative activity claim, including her varying contract, quasi-contract, and "Good Samaritan" tort theories.  Accordingly, the Court denies Mrs. Rocha's motion and enters judgment in favor of Defendants as to all counts.

### A.  Count I: Plaintiff's Legal Malpractice Claim Is Time-Barred

Through Count I, Mrs. Rocha alleges that, in early 2009, Defendants committed legal malpractice by failing to file an asbestos-related lawsuit on behalf of her and her late husband in Maryland state court.[11]  *See* 2d Am. Compl. ¶¶ 2, 4, 33-35, 123-25.  Defendants and Mrs. Rocha

---

[11]     In the Second Amended Complaint, Mrs. Rocha seems to suggest that the decision to file in Virginia constituted legal malpractice in its own right.  *See* 2d Am. Compl. ¶ 121.  Mrs. Rocha's expert, however, concedes that Defendants did not breach the standard of care by filing in Virginia or D.C.  *See* Amato Dep. at 106:7-15.  Under D.C. law, "[u]nless the attorney's lack of care is so obvious that the jury can find negligence as a matter of common knowledge, the standard and its violation must be proved by expert testimony."  *Mills v. Cooter*, 647 A.2d 1118, 1123 (D.C. 1994).  Mrs. Rocha does not argue that expert testimony was not required here, and as a result, to the extent she still asserts that filing in Virginia (or D.C.) was malpractice, her claim fails due to a lack of expert testimony about the duty and breach elements.

each move for summary judgment in their favor on the question of whether this claim was timely

filed under the three-year statute of limitations in D.C. Code § 12-301(8).  In the end, the Court

concludes that Mrs. Rocha's claim was filed after the expiration of the limitations period, and the

Court therefore grants judgment for Defendants on Count I and denies judgment for Mrs. Rocha.

### 1. D.C. Code § 12-301(8) And The "Discovery Rule"

To determine whether Mrs. Rocha's legal malpractice claim was timely filed on June 9,

2014, the Court must resolve when the limitations period began running.  Under D.C. Code § 12-

301(8), which is the District's catch-all limitations provision, legal malpractice claims must be

brought within three years "from the time the right to maintain the action accrues."  *See also*

*Seed Co. Ltd. v. Westerman*, No. CV 8-00355, 2014 WL 3746957, at *4 (D.D.C. July 30, 2014).

"In normal negligence actions — where the harm is often apparent — an injury occurs when the

harm is suffered.  In legal malpractice actions, however — when the harm is often not

immediately identifiable — courts apply the 'discovery rule' to determine when the statute of

limitations begins to run."  *Id.* (internal citations omitted); *see also Bleck v. Power*, 955 A.2d

712, 715 (D.C. 2008).  "The discovery rule states that a claim accrues when the plaintiff becomes

aware — or by the exercise of reasonable diligence should have become aware — of (1) the

harm, (2) its cause in fact, and (3) some evidence of wrongdoing."  *Seed*, 2014 WL 3746957, at

*4 (citing *Bleck*, 955 A.2d at 715; *Wagner v. Sellinger*, 847 A.2d 1151, 1154 (D.C. 2004)).

Defendants argue that under the discovery rule, the limitations period began to run when

the D.C. Superior Court issued its Omnibus Order on January 10, 2011.  *See* B&G Defs.' Mem.

Supp. Mot. Summ. J. at 12.  Mrs. Rocha, on the other hand, argues that the relevant date under

the discovery rule is April 26, 2011, which is when the Superior Court entered the corrected final

order dismissing the entire suit, because "[i]t was at this point that Mrs. Rocha suffered the harm

of having her case dismissed with prejudice as a result of Defendants' negligence and was

damaged." *See* Pl.'s Mem. Supp. Mot. Summ. J. at 22.

Mrs. Rocha's argument misses the mark.  Her legal malpractice claim alleges that

Defendants should have filed a lawsuit in Maryland, and this contention is precipitated by the

fact that on January 10, 2011, the D.C. Superior Court ruled that her asbestos-related claims were

time-barred under the court's application of D.C. Code § 12-311.[12]  In other words, when the

Superior Court issued the Omnibus Order on January 10, Mrs. Rocha learned (or should have

learned) that she no longer had a cognizable claim in D.C., and it was at this point that the harm

from Defendants' failure to file a lawsuit in Maryland became (or should have become) apparent.

The April 26 final order merely dismissed the last defendant so that Mrs. Rocha could file an

appeal; notice of the harm occurred well before that point.  *See Wagner*, 847 A.2d at 1154

("[T]he plaintiff need not be fully informed about the injury for the statute to begin running; she

need only have *some* knowledge of *some* injury….  [K]nowledge is deemed sufficient if the

plaintiff has reason to suspect that the defendant did something wrong, even if the full extent of

the wrongdoing is not yet known." (internal citation omitted)); *Knight v. Furlow*, 553 A.2d 1232,

1236 (D.C. 1989) ("The key issue is client knowledge of some injury, its cause, and related

wrongdoing.").

---

[12]     An argument can be made that the correct date is December 21, 2010, which is
when the D.C. Superior Court orally dismissed Mrs. Rocha's case.  *See Bradley v. Nat'l Ass'n of
Sec. Dealers Dispute Resolution, Inc.*, 433 F.3d 846, 851 (D.C. Cir. 2005) ("[Plaintiff] was on
inquiry notice of her claims for arbitral malpractice no later than [the date] when her complaint
was dismissed with prejudice even though she did not know why.  [Plaintiff's] lack of
knowledge of the precise basis for the dismissal does not toll the running of the statute of
limitations.").  The Court, however, has limited information about what was said by the Superior
Court on that date, and the Court's analysis today is the same regardless of whether December
21, 2010, or January 10, 2011, is the accrual date under the discovery rule.

Accordingly, the Court finds that under the discovery rule, the limitations period for the legal malpractice claim began to run on January 10, 2011.  And if that were the end of the analysis today, there is no question that Mrs. Rocha's claim would be untimely, as her complaint was filed approximately three-and-a-half years later on June 9, 2014.  But the limitations discussion does not stop with the discovery rule; instead, the Court next must consider an exception to the discovery rule that may grant a plaintiff additional time to sue her counsel by tolling the accrual date for malpractice actions: the "continuous representation" rule.

### 2.  "Continuous Representation" Rule Analysis

In cases of alleged legal malpractice, the D.C. Court of Appeals has adopted the "continuous representation" rule, "which tolls the statute of limitations on legal malpractice claims until 'the attorney's representation concerning the particular matter in issue is terminated'" — even if the client was on actual or inquiry notice of the attorney's malpractice before then.  *Seed*, 2014 WL 3746957, at *5 (quoting *R.D.H. Commc'ns, Ltd. v. Winston*, 700 A.2d 766, 768 (D.C. 1997)); *see also Bleck*, 955 A.2d at 715.  The purpose of this exception to the discovery rule "is to respect the attorney-client privilege and to avoid placing the client in 'the untenable position of suing his attorney while the latter continues to represent him.'"  *Seed*, 2014 WL 3746957, at *6 (quoting *R.D.H. Commc'ns*, 700 A.2d at 768).  Under D.C. law, however, what constitutes the "particular matter in issue" and when that matter was "terminated" are questions of fact about which "there is little guidance."  *Id.* at *5.  Nevertheless, to resolve the motions for summary judgment, the Court must answer those two questions next.

Through their motion, Defendants assert that the "particular matter in issue" was their representation of Mrs. Rocha before the D.C. Superior Court under the First Retainer, which they argue, concluded as a result of either the Omnibus Order on January 10, 2011, or at the

latest, the final order on April 26, 2011.  *See* B&G Defs.' Mem. Supp. Mot. Summ. J. at 14;

B&G Defs.' Reply Supp. Mot. Summ. J., ECF No. 51, at 6-7.  Defendants further argue that,

first, their discussions with Mrs. Rocha after the Omnibus Order about a new retainer did not

continue the original representation, and second, the Second Retainer is irrelevant to the

limitations analysis because that agreement involved a new representation for a different

"matter" than the First Retainer.  *See* B&G Defs.' Mem. Supp. Mot. Summ. J. at 16-18.  Lastly,

Defendants argue that any assistance they gave to Mrs. Rocha after the conclusion of the

Superior Court litigation was minimal and insufficient to extend the representation.  *See* B&G

Defs.' Reply Supp. Mot. Summ. J. at 6-7.

   Mrs. Rocha argues that under the continuous representation rule, her complaint was

timely because the limitations period was tolled until the D.C. Court of Appeals granted Brown

& Gould's motion to withdraw as her counsel on June 28, 2011.  *See* Pl.'s Mem. Supp. Mot.

Summ. J. at 22-23.  According to Mrs. Rocha, no earlier date is appropriate because Defendants

remained her counsel of record and filed papers on her behalf in the Superior Court and the

Court of Appeals after the Omnibus Order, such as the two notices of appeal.  *See id*.  Finally,

Mrs. Rocha argues that Defendants' communications with her after the Omnibus Order

demonstrate a continuous attorney-client relationship through June 28, 2011, regardless of the

First Retainer's terms.  *See id*.

   In effect, Mrs. Rocha's argument aims to create a continuous representation by merging

the Superior Court matter into the Court of Appeals matter on the basis that Defendants played a

role in each.  In offering this theory, however, Mrs. Rocha overlooks the fact that the continuous

representation rule applies narrowly to toll the limitations period only until the *particular matter*

*in issue* — that is, the specific matter in which the alleged legal malpractice occurred — is

terminated; consequently, "subsequent general representation of the plaintiffs regarding matters unrelated to the initial transaction does not warrant the application of the doctrine." *De May v. Moore & Bruce, LLP*, 584 F. Supp. 2d 170, 181 (D.D.C. 2008) (quotation marks omitted); *see also Jones v. Lattimer*, 29 F. Supp. 3d 5, 15 (D.D.C. 2014) ("[T]he continuous representation rule does not apply where the attorney represents the same client in a wholly different matter.").

Here, the original representation between Mrs. Rocha and Defendants was defined by the First Retainer, which specifically excluded from the scope of that representation any appeal of the Superior Court matter. *See* First Retainer, Ex. 7 ("I understand that by this Agreement you do not agree to appeal this case should it be necessary."). Indeed, Mrs. Rocha acknowledged in her deposition that, when signing the First Retainer, she knew that she was hiring Defendants exclusively for the trial court proceedings, and she also understood that a new retainer was required if Defendants were to represent her during an appeal. *See* N. Rocha Dep. at 78:18-79:10.

Despite the plain language of the First Retainer, Mrs. Rocha attempts to rely on Judge Huvelle's decision in *De May v. Moore & Bruce, LLP*, to support her position that the first representation continued after the Superior Court's final order, but the Court finds that *De May* does not compel such a result. In *De May*, the plaintiffs had retained the defendant-attorneys to "oversee the overall management of [plaintiffs'] assets," and Judge Huvelle therefore found that the continuous representation rule applied to work defendants had performed both in setting up trusts for the plaintiffs and later in representing the plaintiffs in an appeal to the Tax Court. *See De May*, 584 F. Supp. 2d at 180-84. In reaching this conclusion, Judge Huvelle explained that *De May* was "not a situation where the lawyer's general representation [was] separate and distinct from the alleged malpractice," but rather, "defendants' roles in creating and amending

the trusts, administering the trusts, and defending the trusts against the IRS were all inextricably intertwined and without interruption for almost a decade." *Id.* at 182.

Different facts are in play here. Specifically, Mrs. Rocha and Defendants intentionally contracted through the First Retainer to separate the Superior Court representation from a potential future representation during an appeal — a future representation that would (and did) require a new agreement with new terms and a new scope. The parties never agreed to enter a broad, ongoing representation like that in *De May*. As such, Mrs. Rocha was on notice from the start that the first representation would terminate when the Superior Court matter ended and that a new agreement was required if she desired to retain Defendants for an appeal. When attorneys and their client agree to formally compartmentalize the representation in such a specific and unambiguous manner, the Court declines to simply ignore the legal services contract for purposes of the continuous representation rule analysis, as Mrs. Rocha appears to advise. *Cf. Shelton v. The Ritz Carlton Hotel Co.*, 550 F. Supp. 2d 74, 80 (D.D.C. 2008) ("[U]nder both D.C. and federal law one who signs a contract has a duty to read it and is obligated according to its terms."); *Hart v. Vt. Inv. Ltd. P'ship*, 667 A.2d 578, 584 (D.C. 1995) ("[W]e know of no legal authority permitting the court to rewrite the contract by inserting a limitation which does not appear therein.").

Indeed, even in *De May*, the primary case on which Mrs. Rocha relies, Judge Huvelle considered a similar possibility by asking whether there was any reason to define the "particular matter in issue" more narrowly, but the Court found that "the facts relating to defendants' legal work cannot be conveniently divided into transactional work versus litigation given the extensive overlap between these functions." *De May*, 584 F. Supp. 2d at 182. Thus, rather than *De May*, the facts here are more similar to those in *Encyclopaedia Britannica, Inc. v. Dickstein Shapiro,*

*LLP*, Civ. No. 10-0454, 2012 WL 8466139 (D.D.C. Feb. 2, 2012).  There, Judge Bates declined

to apply the continuous representation rule because the "particular matter in issue" was the

defendant-law firm's patent prosecution work for the plaintiff, and the Court found that this work

was legally separate and distinct from subsequent patent infringement litigation in which the

defendant played only a minor role.  *See id*. at *13-16.  In reaching this conclusion, Judge Bates

emphasized that one important reason for drawing the line between the two matters was that the

plaintiff "itself considered the representation 'divided into transactional work versus litigation.'"

*Id*. at *16 (quoting *De May*, 584 F. Supp. 2d at 182).

Likewise here, the representation under the First Retainer included only the trial court

litigation, and the alleged malpractice occurred only within that representation, not during the

later appellate representation for which a new retainer was signed.  Thus, given the parties'

agreement, the "particular matter in issue" ended, at the latest, with the Superior Court's

corrected final order on April 26, 2011.[13]  Following this approach, the continuous representation

rule tolled the limitations period from January 10, 2011, to April 26, 2011, which still is

insufficient to make the legal malpractice claim in Mrs. Rocha's June 9, 2014, complaint timely

under D.C. Code § 12-301(8).[14]

---

[13]    Though Defendants suggest that the Court should use the January 10, 2011, date
of the Omnibus Order, they also acknowledge that the final order on April 26, 2011, officially
and fully concluded the Superior Court litigation.  *See* B&G Defs.' Reply Supp. Mot. Summ. J.
at 7.  The Court's analysis is identical using either point in time.

[14]    Though a professional, and not legal, malpractice case, the discussion in
*Williamson ex rel. Lipper Convertibles, L.P. v. PricewaterhouseCoopers LLP*, 872 N.E.2d 842
(N.Y. 2007), is instructive.  There, the New York Court of Appeals found that the client had
"entered into annual engagements with defendant for the provision of separate and discrete audit
services…, and once defendant performed the services for a particular year, no further work as to
that year was undertaken."  *Id*. at 847.  The court refused to apply the continuous representation
rule because, despite the "continuing professional relationship," there was "not a course of
representation as to the particular problems (conditions) that gave rise to plaintiff's malpractice
claims."  *Id*.  In other words, the "particular matter in issue" for purposes of the continuous

The Court, however, recognizes that an attorney's duties to a client may arise not just through a contract but also "'from the establishment of a fiduciary relationship between attorney and client.'"  *In re Samad*, 51 A.3d 486, 497 (D.C. 2012) (quoting *In re Ryan*, 670 A.2d 375, 379 (D.C. 1996)); *see also Heine v. Colton, Hartnick, Yamin & Sheresky*, 786 F. Supp. 360, 368 (S.D.N.Y. 1992) ("While the employment of an attorney by a client is largely governed by the contractual provisions of the retainer, elements of trust and confidence endemic in the attorney/client relationship add a dimension to the retainer beyond the terms of the retainer agreement." (quotation marks omitted)).  As such, the contract between the parties, though highly instructive, is not necessarily dispositive here.  The Court thus finds it appropriate to consider whether any other facts support holding that the original representation continued beyond the end of the Superior Court litigation.

In short, the Court's review of the undisputed facts of this case reveals no basis for upending the plain terms of the First Retainer and extending the relevant representation past April 26, 2011.  To start, on March 4, 2011, Brown sent a letter to Mrs. Rocha reiterating that the First Retainer covered only the Superior Court matter and proposing new terms for a retainer that would apply to an appeal.  *See* Brown Letter, Mar. 4, 2011, Ex. 14.  Mrs. Rocha declined Brown's offer.  *See* N. Rocha Dep. at 84:12-85:13, 87:6-10; M. Rocha Dep. at 128:20-130:18. The relationship between Mrs. Rocha and Defendants then continued to deteriorate over the course of March, April, and early May, as Mrs. Rocha ignored Brown's attempts to negotiate a new retainer and to discuss a litigation strategy moving forward.  *See, e.g.*, Brown Letter, Apr.

---

representation rule terminated at the end of each engagement agreement, even if the parties maintained a relationship after each matter ended.  Similarly here, the alleged malpractice undisputedly occurred under the First Retainer, and that retainer, by its terms, ended on April 26, 2011.  Any later relationship between the parties is irrelevant under the continuous representation rule.

12, 2011, Ex. 15; Brown Letter, Apr. 29, 2011, Ex. 16; Brown Letter, May 6, 2011, Ex. 17;

Brown Letter, May 12, 2011, Ex. 18.  Further, during this period in early 2011, Mrs. Rocha and

her son considered hiring new counsel for the appeal or proceeding *pro se*, and Defendants

therefore were left wondering for several months whether Mrs. Rocha would hire them for the

appeal.  *See, e.g.*, Brown Letter, Apr. 29, 2011, Ex. 16; Brown Letter, May 12, 2011, Ex. 18; M.

Rocha Dep. at 139:5-140:22, 142:18-144:22.  Still without a decision from Mrs. Rocha nearly a

month after the final order and several months after the Omnibus Order, Brown sent a letter to

Mrs. Rocha on May 20, 2011, unequivocally stating that "[t]his concludes our representation of

you at the trial level in this matter."[15]  Brown Letter, May 20, 2011, Ex. 19.  In the end, Michael

Rocha did not inform Brown that Mrs. Rocha would sign the Second Retainer until ten minutes

before Brown's 5:00 PM deadline on May 23, 2011.  *See* M. Rocha Email, Ex. 21.

Overall, the events during the months between the Omnibus Order and the signing of the

Second Retainer on May 23 — *e.g.*, the prolonged communication breakdown, Brown's letter

informing Mrs. Rocha that the representation had ended, and Mrs. Rocha's refusal to sign a new

retainer while considering alternatives for the appeal, including the option to hire new counsel —

demonstrate that the original attorney-client relationship had ceased in a manner fully consistent

with the terms of the First Retainer.  *See, e.g.*, *Williams v. Mordkofsky*, 901 F.2d 158, 163 (D.C.

Cir. 1990) (finding that the continuous representation rule was inapplicable when the attorney

and client had become adversarial, and the client was no longer relying on the attorney for legal

advice); *Flynt v. Brownfield, Bowen & Bally*, 882 F.2d 1048, 1051 (6th Cir. 1989) ("[C]onduct

dissolving the essential mutual confidence between attorney and client signals the termination of

---

[15]     Even if the limitations period were tolled until Brown's May 20, 2011, letter, Mrs. Rocha's legal malpractice claim still would be untimely.

the professional relationship." (quotation marks omitted)); *Shumsky v. Eisenstein*, 750 N.E.2d 67, 72-73 (N.Y. 2001) (reasoning that even if the client contemplated a future representation, "the continuous representation toll would nonetheless end once the client is informed or otherwise put on notice of the attorney's withdrawal from representation"); *Hancock v. Mut. of Omaha Ins. Co.*, 472 A.2d 867, 869 (D.C. 1984) (explaining, in the context of a motion to withdraw as counsel, that "[w]hen a client leaves telephone calls and letters unanswered, thus refusing to communicate with his attorney,… the attorney should not be forced to proceed with the case"). Accordingly, the Court finds no reason to deviate from the plain terms of the First Retainer, and the Court therefore concludes that the relevant "matter in issue" terminated at the final conclusion of the Superior Court litigation on April 26, 2011.

Mrs. Rocha offers several arguments for why the relationship did not end on April 26, but the Court finds none of them persuasive.[16]  For example, without citing any evidence, Mrs. Rocha suggests that "Defendants repeatedly offered legal advice and counsel to Mrs. Rocha about how to proceed with her case after the entry of final judgment" by the Superior Court.  *See* Pl.'s Mem. Supp. Mot. Summ. J. at 23-24.  Brown, however, only offered "advice" to Mrs. Rocha, if at all, in the context of attempting to negotiate a new retainer for the appeal and to prevent Mrs. Rocha from waiving her appeal rights by missing a filing deadline.  The Court declines to apply the continuous representation rule in a way that would punish attorneys for providing such minimal assistance to protect their client's rights after the initial matter concludes.  *See Williams*, 901 F.2d at 163 (rejecting argument that the continuous representation

---

[16]      Mrs. Rocha also argues that the relationship continued when Defendants filed the first notice of appeal on February 4, 2011, and the motion to reinstate the Superior Court action and for the entry of a final order on March 24, 2011.  Though such events might be relevant to why the January 10 Omnibus Order is not the proper accrual date, they are not evidence of why the representation continued *after* the April 26 final order, as the Court holds today.

rule was "broad enough to allow extension of the rule to any negotiations between an attorney and a former client that seek to repair damage done during the representation"); *Encyclopaedia Britannica*, 2012 WL 8466139, at *15 (refusing to apply the continuous representation rule to an attorney's "minimal participation in a client's ongoing affairs" because attorneys then "would have substantial disincentives from providing even the barest assistance to clients regarding matters in which they are knowledgeable based on their prior representation of the client").

Mrs. Rocha also argues that "Brown continued to refer to [her] as his client in correspondence with her on the day she signed a retainer agreement for the appeal," and that the limitations period was tolled because Defendants filed the second notice of appeal on May 24, 2011. *See* Pl.'s Mem. Supp. Mot. Summ. J. at 24. These events, however, relate only to the representation under the Second Retainer; they suggest nothing about continuing the relationship under the First Retainer, which Mrs. Rocha knew had terminated by this point.[17] Alternatively, even accepting Mrs. Rocha's argument that the relationship continued through the filing of the second notice of appeal, this event occurred well *before* June 9, 2011, such that it is insufficient to make the legal malpractice claim timely.

In the end, Mrs. Rocha offers only one argument for why the limitations period should be tolled until *after* June 9, 2011: The D.C. Court of Appeals did not grant Brown & Gould's

---

[17]     Filing the second notice of appeal also qualifies as the type of ministerial act that courts find to be insufficient to toll the limitations period under the continuous representation rule. *See, e.g.*, *Encyclopaedia Britannica*, 2012 WL 8466139, at *15 ("minimal participation in a client's ongoing affairs" does not toll the limitations period under the continuous representation rule); *Farage v. Ehrenberg*, 996 N.Y.S.2d 646, 654 (N.Y. App. Div. 2014) (explaining that the "Consent to Change Attorney form … performs a mere ministerial task of informing the court, other parties, and the world that the defendant was no longer authorized to act on the plaintiff's behalf as counsel" and therefore "does not identify, for continuing representation purposes, the benchmark date that the parties' attorney-client relationship was actually terminated by the plaintiff"); *Yang Enters., Inc. v. Georgalis*, 988 So.2d 1180, 1183 (Fla. Dist. Ct. App. 2008) ("[M]inisterial work does not meet the definition of the continuous representation rule[.]").

motion to withdraw as counsel until June 28, 2011.  *See id.* at 23.  Mrs. Rocha's position,

however, ignores the nature of the continuous representation rule, which only "tolls the statute of

limitations on legal malpractice claims until the attorney's representation concerning the

*particular matter in issue* is terminated."  *Seed*, 2014 WL 3746957, at *5 (quotation marks

omitted; emphasis added).  As defined by the contract and confirmed by the actions of the

parties, the "matter in issue" here was Defendants' representation during the Superior Court

litigation under the First Retainer, which ended on April 26, 2011, at the latest.[18]  The Court,

moreover, finds no support for Mrs. Rocha's suggestion that the formal withdrawal date, rather

than the parties' contract and conduct, should control the continuous representation rule analysis.

*Cf. Casas-Cordero v. Salz*, No. 11-CV-1713, 2012 WL 2190879, at *4 (S.D. Cal. June 14, 2012)

("[A]n attorney's representation does not depend on formal termination, and thus the notice of

withdrawal alone fails to demonstrate continuous representation…. Rather, an attorney's

representation ends when the parties so agree." (internal citation omitted)); *Aaron v. Roemer,*

---

[18]        The situation in *Flynt v. Brownfield, Bowen & Bally*, 882 F.2d 1048 (6th Cir. 1989), is analogous to Mrs. Rocha's case.  There, the Sixth Circuit declined to apply the continuous representation rule to the plaintiff's legal malpractice claim, which was based on conduct by the defendant-law firm in 1980 and 1981.  *See id.* at 1048-49.  On February 16, 1982, the defendant terminated the first representation, but the parties signed a new agreement on March 12, 1982.  *See id.* at 1049.  In holding that the first relationship did not "continue" through the new March 12 agreement, the court explained:

> The February 16 letter clearly expressed the [law firm's] intent to terminate its professional relationship with the plaintiffs, and, in our opinion, this letter constitutes … an 'affirmative act' sufficient to put the plaintiffs on notice that their attorney-client relationship with defendants had terminated.  Furthermore,… the relationship between the parties arising from the March 12 letter agreement was *a new relationship, which was separate and distinct from the attorney-client relationship existing prior to February 16.*

*Id.* at 1052 (emphasis added).  Here, Defendants' alleged malpractice occurred under the First Retainer, which was terminated well before June 9, 2011, and the relationship under Second Retainer was "separate and distinct" from that prior relationship.

*Wallens & Mineaux, LLP*, 707 N.Y.S.2d 711, 714 (N.Y. App. Div. 2000) (when "the attorney promptly moves to withdraw and the client acknowledges in writing an irreparable deterioration of the attorney-client relationship,… the relationship necessary to invoke the continuous [representation] rule did not persist until formal termination…, but rather ceased with the disruption of the client's trust and reliance").

Finally, courts in this Circuit consistently look to the continuous representation rule's purpose — which is "to avoid placing a client in the untenable position of suing his attorney while the latter continues to represent him," *Williams*, 901 F.2d at 163 — when determining whether to apply the rule to a particular set of facts. *See, e.g.*, *Encyclopaedia Britannica*, 2012 WL 8466139, at *15 (the "purpose of the continuous representation rule would not be served by triggering the rule" under the facts of the case); *Seed*, 2014 WL 3746957, at *6 ("Any other ruling [under the facts of the case] would run afoul of the continuous representation rule's purpose.").

Here, the Court finds that Mrs. Rocha was never placed in an "untenable" position that prevented her from filing a lawsuit against her counsel during the period between the April 26, 2011, final order (or even the January 10, 2011, Omnibus Order) and the signing of the Second Retainer — a period during which no substantive litigation activity was occurring before either the D.C. Superior Court or the D.C. Court of Appeals.  To the contrary, Mrs. Rocha received notice that the representation under the First Retainer had terminated, and up through May 23, 2011, *she* made the decision not to continue the relationship during this dormant period by refusing Brown's many attempts to negotiate a new retainer.  Thus, Mrs. Rocha had no reasonable expectation during this time that Defendants would continue representing her in the future, as she was the one who refused to maintain a relationship of trust and communication by

ignoring Brown's efforts while actively considering her alternatives for the future.  Absent a

sufficient hardship preventing Mrs. Rocha from filing a malpractice lawsuit during the period

after the original representation ended, the Court finds no policy justification for applying the

rule to toll the limitations period beyond that termination date.[19]  Accordingly, the Court

concludes that the legal malpractice claim in Mrs. Rocha's June 9, 2014, complaint is time-

barred.

### B.  Count I: Plaintiff's Legal Malpractice Claim Fails On The Merits

Even if Mrs. Rocha's legal malpractice claim were timely filed on June 9, 2014, the

Court finds that the claim also would fail on the merits, which provides an alternative basis for

entering judgment in favor of Defendants on Count I.

### 1.  Plaintiff Concedes That The Judgmental Immunity Doctrine Applies

To prevail on a legal malpractice claim under D.C. law, a plaintiff must demonstrate the

applicable standard of care, a breach of that standard by the attorney, and that the attorney's

breach proximately caused the complained of harm.  *See Biomet Inc. v. Finnegan Henderson

LLP*, 967 A.2d 662, 664 (D.C. 2009); *Chase v. Gilbert*, 499 A.2d 1203, 1211 (D.C. 1985).  D.C.

courts also apply the "judgmental immunity" doctrine in legal malpractice cases, which

forecloses liability against an attorney when "(1) the alleged error is one of professional

judgment, and (2) the attorney exercised reasonable care in making [that] judgment."

*Encyclopaedia Britannica*, 2012 WL 8466139, at *17; *see also Biomet*, 967 A.2d at 665.

---

[19]      In *De May*, the Court explained that the continuous representation rule also "is
meant to honor a client's decision to stay with his current counsel notwithstanding indications of
malpractice."  *De May*, 584 F. Supp. 2d at 184.  Mrs. Rocha made the opposite choice: She
refused to commit to staying with her counsel after the original matter ended, and she only
returned to the counsel at the last minute on May 23, 2011.  Allowing her to undo that choice by
finding a continuous representation would turn the policy underlying the rule on its head.

Application of this doctrine is especially appropriate when an attorney made an error of judgment regarding an "unsettled proposition of law" because "an attorney is not expected, much less required, to accurately predict developments in the law." *Biomet*, 967 A.2d at 668; *see also Mills*, 647 A.2d at 1122 ("An attorney is not liable for an error of judgment regarding an unsettled proposition of law.").

Defendants move for summary judgment on the basis that the judgmental immunity doctrine bars Mrs. Rocha's legal malpractice claim.  *See* B&G Defs.' Mem. Supp. Mot. Summ. J. at 27.  In particular, Defendants argue that the decision about whether to file in Maryland or elsewhere required the application of their professional judgment to unsettled legal questions regarding the various state limitations periods in play.  *See id*. at 30-32.  Defendants further argue that given this uncertain legal landscape, they made an informed decision by assessing the risks and benefits of filing in each forum, including Maryland.  *See id*. at 41-44.  Thus, according to Defendants, even if Maryland also was a suitable forum in February 2009 — a fact that Defendants dispute — Mrs. Rocha's malpractice claim fails because the judgmental immunity doctrine shields them from liability for their decision.  *See id*. at 31-32.

Mrs. Rocha does not respond to Defendants' lengthy judgmental immunity argument, nor does she challenge the many judgmental immunity cases that Defendants cite.  Instead, Mrs. Rocha relies on her expert's testimony to argue that the standard of care required Defendants to file a lawsuit in Maryland.  Because Mrs. Rocha ignores the judgmental immunity doctrine in her opposition, she concedes that Defendants exercised reasonable care when making the forum selection decision.  *See COMPTEL v. FCC*, 945 F. Supp. 2d 48, 55 (D.D.C. 2013) ("Where a party fails to address arguments raised by the opposing party's motion for summary judgment, the Court may treat those arguments as conceded."); *Hopkins v. Women's Div., Gen. Bd. of*

*Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) ("It is well understood in this Circuit

that when a plaintiff files an opposition to a dispositive motion and addresses only certain

arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to

address as conceded.").  The Court therefore may enter judgment for Defendants as to Count I on

this basis.

2.  Plaintiff's Standard Of Care Argument Also Proves Why The Judgmental Immunity Doctrine

Would Apply

In addition to conceding the judgmental immunity issue, Mrs. Rocha's separate standard

of care argument also proves why the doctrine would apply here.  In particular, Mrs. Rocha's

expert, John Amato, IV, opined that, even without evidence of Maryland asbestos exposure,

Brown should have known that Maryland would be a more favorable forum than D.C. because

the presumed application of Maryland law to at least the wrongful death portion of Mrs. Rocha's

asbestos-related claims (but not her survival action) would not have been at risk for dismissal,

whereas dismissal of the entire claim was a risk in D.C. under D.C. Code § 12-311.[20]  *See* Amato

---

[20]     Amato's alternative theory for why Defendants breached the standard of care is
that Defendants were required to file a Maryland lawsuit based on the possibility that Mr. Rocha
might have been exposed in that state given his other work in the D.C. area, despite no evidence
of actual or potential Maryland exposure at the time of filing in 2009.  *See* Amato Dep. at 56:2-
59:15, 74:3-75:22.  Simply put, Amato's opinion flies in the face of Rule 11 and its Maryland
equivalent, Maryland Rule of Civil Procedure 1-311, and the Court therefore refuses to follow
Amato's approach.  *See Intelsat USA Sales LLC v. Juch-Tech, Inc.*, No. CV 10-2095, 2014 WL
2959269, at *3 (D.D.C. July 2, 2014) ("Rule 11 is designed to insure that allegations made in a
filing are supported by a sufficient factual predicate at the time that the claims are asserted.  As
such, it is no answer to a motion seeking Rule 11 sanctions to suggest that plaintiffs needed
discovery to ascertain whether the claim asserted was well founded." (internal citation, quotation
marks, and alterations omitted)); *Barlow v. McLeod*, 666 F. Supp. 222, 229 (D.D.C. 1986)
("[C]ounsel's failure to make sure the original complaint was well grounded in fact is clearly a
violation of Rule 11."); *see also Mills*, 647 A.2d at 1121 ("An attorney is under no obligation …
to maintain a position which the attorney does not believe that he can honorably defend, even if
that position is urged upon him by the client.").  The B&G Defendants move to strike this
testimony as an improper expert opinion, *see* B&G Defs.' Mot. to Strike, ECF No. 36, at 3, but

Dep. at 94:2-18; *see also* Pl.'s Stmt. Facts in Dispute ¶ 38.  It is undisputed, however, that the following legal questions were unresolved in February 2009: (1) how a D.C. court would interpret D.C. Code § 12-311 in the context of asbestos-related claims like Mrs. Rocha's; (2) whether the Virginia Supreme Court would reverse lower court decisions regarding how the state's statute of repose applied to asbestos-related claims like Mrs. Rocha's;[21] and (3) how a Maryland court would apply Maryland's borrowing statute to interpret and apply D.C.'s wrongful death action law, D.C.'s limitations provision in § 12-311, and Virginia's statute of repose in the context of an asbestos-related case filed by a non-Maryland resident with evidence of only D.C. and Virginia exposure.  As to the third question, it remained unsettled at the time because, as Mrs. Rocha recognizes, a Maryland court was yet to apply the state's borrowing statute in the context of a case like Mrs. Rocha's.  *See* Pl.'s Stmt. Facts in Dispute ¶¶ 143, 145; *see also* Amato Dep. at 140:17-20.

Amato further opined that an attorney's decision about where to file a lawsuit is "a matter of weighing the factors and applying [his or her] professional judgment," Amato Dep. at 41:1-8, and Amato testified that "Brown exercised his professional judgment in deciding to file the case in D.C. … and to file a back-up suit … in Virginia," *see id*. at 129:2-13.  *See also id*. at 106:7-15. Nonetheless, Amato still asserted that Brown breached the standard of care by not filing a lawsuit in Maryland.  *See id.* at 106:11-12; *see also* Pl.'s Mem. Supp. Mot. Summ. J. at 45. Thus, according to Amato, Brown exercised his professional judgment to evaluate whether to file

---

the Court denies this aspect of their motion as moot because Amato's testimony, even if accepted, is insufficient to sustain Mrs. Rocha's malpractice claim.

[21]     *See* Amato Dep. at 170:8-12 ("Was there a good shot, a good chance that the Virginia Supreme Court when they heard the issue would reverse the decisions in *Tate* and *Ring* or go the other way than *Tate* and *Ring*, yeah, there sure was."); 170:20-22 ("Q: You don't know how [the Virginia Supreme Court] would come out, you say?  A: I don't.").

in D.C. and Virginia, but the standard of care also *required* Brown — and thus placed the filing decision outside Brown's professional judgment as a matter of law — to file a lawsuit in Maryland because that state may have been another suitable forum. But Mrs. Rocha cannot have it both ways, particularly given Amato's testimony that he regularly exercises his own professional judgment when making identical forum selection decisions within his law practice. *See, e.g.*, Amato Dep. at 41:22-46:1, 65:2-66:10, 89:1-19. Clearly, the decision about whether to file in Maryland — as well as whether to file in D.C., Virginia, or any other state — was one of the many strategic choices that involved Brown's professional judgment after evaluating the risks and benefits of the decision.

Finally, Mrs. Rocha presents no evidence that Brown's *decision-making process* was unreasonable or insufficient when he exercised his judgment about where to file; Mrs. Rocha and her expert simply disagree with Brown's final decision about the suitability and necessity of filing in Maryland given the unsettled nature of how a Maryland court would evaluate Mrs. Rocha's hypothetical lawsuit. *Cf.* Brown Aff. ¶ 19-20 (discussing considerations for deciding where to file Mrs. Rocha's claims). The judgmental immunity doctrine, however, prohibits hindsight attacks that are based on unsettled legal questions "about which reasonable attorneys could disagree," as was the case here in regard to how a Maryland court — as well as a D.C. court and a Virginia court — would evaluate Mrs. Rocha's case. *Encyclopaedia Britannica*, 2012 WL 8466139, at *16; *see also Biomet*, 967 A.2d at 667 (the question is "whether that professional judgment was reasonable at the time it was made, not whether a different strategy may have resulted in a more favorable judgment" for the client); *Mills*, 647 A.2d at 1121 ("[W]here reasonable attorneys could differ with respect to the legal issues presented, the second-guessing after the fact of [the attorney's] professional judgment [is] not a sufficient

foundation for a legal malpractice claim[.]").  Accordingly, because the forum decision was committed to Brown's professional judgment, and because Mrs. Rocha fails to create a genuine dispute of fact that Brown failed to engage in a reasonable process when exercising that judgment in February 2009, the judgmental immunity doctrine applies to bar the legal malpractice claim in Count I.

   3.  Plaintiff Concedes That The Legal Malpractice Claim Lacks The Proximate Cause Element

        The "elements of an action for professional negligence are the same as those of an ordinary negligence action," and a plaintiff asserting a legal malpractice claim therefore must establish "that the attorney's negligence resulted in and was the proximate cause of a loss to the client."  *Chase*, 499 A.2d at 1211 (quotation marks omitted); *see also Macktal v. Garde*, 111 F. Supp. 2d 18, 21 (D.D.C. 2000).  In their motion for summary judgment, Defendants argue that proximate cause is lacking here because "the fate of the Rocha case, had it been filed in Maryland, is at best an issue of pure guess-work requiring the impermissible use of both hindsight and speculation as to different legal results a court might reach."  B&G Defs.' Mem. Supp. Mot. Summ. J. at 40; *see also Pietrangelo v. Wilmer Cutler Pickering Hale & Dorr, LLP*, 68 A.3d 697, 710 (D.C. 2013) ("We have declined to find proximate cause where we would have to speculate about a legal result."); *Chase*, 499 A.2d at 1212 ("more is required than speculation" to establish that an "attorney's negligence caused a legally cognizable injury").

        Mrs. Rocha fails to address this argument and instead simply responds that Defendants confuse professional judgment with proximate cause.  *See* Pl.'s Mem. Supp. Mot. Summ. J. at 58.  But only Mrs. Rocha is confused, as proximate cause clearly is a distinct, and necessary, element for a legal malpractice claim.  By ignoring Defendants' proximate cause argument, Mrs. Rocha concedes the issue, and her legal malpractice claim fails for this reason as well.

### C.  Count II: Plaintiff's Breach Of Fiduciary Duty Claim Fails

Under D.C. law, when a plaintiff's breach of fiduciary duty claim is "indistinguishable from [her] legal malpractice claim, [her] inability to prove the malpractice claim renders [the fiduciary duty claim] unsustainable."  *Johnson v. Sullivan*, 748 F. Supp. 2d 1, 12 (D.D.C. 2010); *see also Mawalla v. Hoffman*, 569 F. Supp. 2d 253, 257 (D.D.C. 2008) ("In professional malpractice cases, additional claims which are based on the underlying malpractice claim cannot survive if the professional malpractice claim fails.").  On the other hand, courts applying D.C. law have found a distinct fiduciary duty claim only under narrow circumstances, such as when the conduct involved an alleged violation of the Rules of Professional Conduct regarding loyalty or the reasonableness of fees.  *See, e.g.*, *So v. Suchanek*, 670 F.3d 1304, 1308 (D.C. Cir. 2012) ("a breach occurs when an attorney represents clients with conflicting interests" (quotation marks omitted)); *Hickey v. Scott*, 738 F. Supp. 2d 55, 67-68 (D.D.C. 2010) (finding that the fee-related fiduciary duty claim is distinct from the legal malpractice claim); *Shapiro, Lifschitz & Schram, P.C. v. Hazard*, 24 F. Supp. 2d 66, 75-76 (D.D.C. 1998) (discussing distinct fiduciary duty claim based on allegations of unconscionable fees).

Here, it is undisputed that Mrs. Rocha's fiduciary duty and legal malpractice claims involve identical underlying conduct (*e.g.*, Defendants' failure to file a Maryland lawsuit), and there is no evidence even hinting at a separate fiduciary duty owed to Mrs. Rocha beyond the representation that gave rise to the failed legal malpractice claim.  *See* B&G Defs.' Mem. Supp. Mot. Part. J. Plead., ECF No. 22-1, at 4-5.  Accordingly, the Court grants summary judgment for Defendants as to Count II because Mrs. Rocha fails to establish a legally distinct cause of action for breach of fiduciary duty.  *See Macktal*, 111 F. Supp. 2d at 23 ("[I]f plaintiff is unable to prove his professional negligence claim, contract and tort claims which are essentially

restatements of the failed malpractice claim must also fail."); *Biomet*, 967 A.2d at 670 n.4

("Biomet's attempt to recast its malpractice argument as also breach of contract and breach of

fiduciary duty fails.").

### D.  Count III: Plaintiff Fails To State A Cognizable Legal Theory Of Recovery For Her Legislative Activity Claim

Trying to pin down the legal theory underlying Mrs. Rocha's legislative activity claim in

Count III is akin to playing a game of "Whack-a-Mole" for Defendants: Every time Defendants

believe they are about to hammer down one theory of recovery, that theory vanishes and a new

theory pops up elsewhere.  Nevertheless, for the reasons explained next, the Court concludes that

despite her many attempts to recharacterize the basis for this claim, Mrs. Rocha fails to state any

cognizable legal theory entitling her to relief based on Brown's legislative activity.

#### 1.  History Of The Legislative Activity Claim

Mrs. Rocha filed her original Complaint in D.C. Superior Court on June 9, 2014, and she

filed a substantively identical First Amended Complaint on June 22, 2014.[22]  In the First

Amended Complaint, Mrs. Rocha alleged that during the asbestos-related litigation before the

D.C. Superior Court, Brown sought and obtained multiple extensions from the court in order to

"buy time" to "solicit the Council of the District of Columbia … to amend [§] 12-311."  1st Am.

Compl. ¶ 36.  Mrs. Rocha further alleged that the D.C. Council passed an emergency resolution

to amend § 12-311, that Brown "actively participated in drafting" this resolution, and that the

revised statute did not include a retroactivity provision that might have made her claims timely.

*See id.* ¶¶ 37-41.  Based on these allegations, Mrs. Rocha asserted a cause of action for breach of

---

[22]      The First Amended Complaint merely changed the name of defendant "The
Lipman Law Firm" to "David M. Lipman, P.A."  *See* 1st Am. Compl., ECF No. 4-1, at 7.

contract in Count III based on Defendants' "express and implied contractual obligations to Mrs. Rocha that they would take all action legally necessary and appropriate to protect her interests and advance her claims." *Id*. ¶ 53.  In response, the B&G Defendants filed a motion for partial judgment on the pleadings under Rule 12(c) that sought dismissal of the legislative activity allegations and claims because, among other reasons, the pleaded facts did not establish a duty owed to Mrs. Rocha independent of the legal malpractice claim.  *See* B&G Defs.' Mem. Supp. Mot. Part. J. Plead. at 9-12.

And thus began the game of "Whack-a-Mole."  Rather than addressing the B&G Defendants' motion, Mrs. Rocha responded by filing a motion for leave to file a Second Amended Complaint, which the Court granted on January 9, 2015.  *See* Order, ECF No. 39.  In this superseding complaint, Mrs. Rocha alleged, for the first time, that on February 10, 2009, the same day she signed the First Retainer, Brown made an oral promise to her that he would "get the District of Columbia statute of limitations [in § 12-311] changed to make her claim timely there."  *See* 2d Am. Comp. ¶ 3; *see also id*. ¶¶ 36-40.  The B&G Defendants responded by filing an opposition to Mrs. Rocha's motion for leave arguing that her breach of an oral contract theory failed due to both the parol evidence rule and the lack of separate consideration.  *See* B&G Defs.' Mem. Opp'n Mot. Leave, ECF No. 26, at 15-18.

Rather than addressing these arguments, Mrs. Rocha attempted to change course once more by filing a reply to the B&G Defendants' opposition that argued, again for the first time, that promissory estoppel applied to excuse the lack of consideration for Brown's alleged oral promise.  *See* Pl.'s Reply Supp. Mot. Leave, ECF No. 27, at 19-20.  Trying to catch up, the B&G Defendants responded by filing a motion to strike the promissory estoppel argument from Mrs. Rocha's reply brief, and the motion to strike alternatively argued that the promissory estoppel

theory itself failed as a matter of law.  *See* B&G Defs.' Mem. Supp. Mot. Strike, ECF No. 28-1, at 1-4.  Mrs. Rocha did not respond to the promissory estoppel arguments; instead, the theory underlying her legislative activity claim shifted yet again.

This time, Mrs. Rocha offered a theory that was not raised in any complaint, but rather was offered for the first time by her expert.  Specifically, Amato rejected Mrs. Rocha's prior theories that Brown owed her an affirmative duty to get D.C. Code § 12-311 changed, and Amato instead opined that Brown's only duty to achieve legislative change on Mrs. Rocha's behalf arose under the voluntary undertaking, or "Good Samaritan," doctrine:

> A:  I don't think an attorney has an affirmative duty to undertake a legislative change.  My opinion has been that he assumes the status of a volunteer, that … he voluntarily undertook a change to 12-311.
>
> . . . .
>
> A:  I don't believe that it's true that no duty existed.  What I said was no affirmative duty existed in the first place; but that once that action was taken voluntarily, a duty arose, particularly under circumstances where Mr. Brown tied his effort to the facts of the Rocha case when he approached the D.C. Trial Lawyers.
>
> . . . .
>
> Q:  What's your legal basis for saying that he has a duty?…
>
> A:  The same volunteer basis that creates the duty in people that render emergency medical … before a Good Samaritan statute.

Amato Dep. at 207:16-21, 216:5-11, 217:10-15.  To summarize, Mrs. Rocha's legislative activity claim in Count III has taken the following dizzying path: (a) first, she alleged breach of a written contract; (b) then, the breach of a written contract theory was abandoned and replaced with the breach of an oral contract theory; (c) next, it was not breach of any contract (written or oral), but rather a quasi-contract promissory estoppel claim; and finally (d) it was not an affirmative contract or quasi-contract duty, but rather only a "Good Samaritan" tort duty.  The Court turns to those remaining theories next.[23]

_____

[23]     Upon filing, the Second Amended Complaint became the operative document, and the breach of a written contract theory raised exclusively in the First Amended Complaint

2.  Plaintiff's Breach Of An Oral Contract And Promissory Estoppel Theories Fail

In the Second Amended Complaint, Mrs. Rocha alleges that on February 10, 2009, Brown made an oral promise prior to her signing the First Retainer that he would "get the District of Columbia statute of limitations [in § 12-311] changed to make her claim timely there[.]"  *See* 2d Am. Comp. ¶ 3.  A genuine dispute of fact exists as to whether Brown actually made a promise to Mrs. Rocha about his legislative activity with the DC-TLA.  *Compare* N. Rocha Dep. at 127:14-129:15 (testifying that Brown promised to get D.C. Code § 12-311 changed), *and* Pl.'s Resp. to Interrog. 11, Ex. 34 ("On or about February 9, 2009,… Brown promised Mrs. Rocha that he would get the law changed to make sure her case would be deemed timely by the D.C. courts and informed her that he was already working on achieving the legislative change."), *with* Brown Aff. ¶ 25 ("I did not tell the Rochas that I would change the law in D.C. nor did I promise to do so."); *see also* Pl.'s Stmt. Facts in Dispute ¶ 102.  But a factual dispute is "material," and thus sufficient to prevent summary judgment, only if it affects the substantive outcome of the litigation.  *See Liberty Lobby*, 477 U.S. at 248.  Here, the Court finds that this dispute is not material because, assuming *arguendo* that Brown made the promise as alleged, Mrs. Rocha's theory still fails.

Specifically, Defendants argue that Mrs. Rocha's oral promise theory fails under the parol evidence rule, which provides that "extrinsic or parol evidence which tends to contradict,

---

was superseded and abandoned.  *See Singh v. District of Columbia*, No. CV 10-1615, 2014 WL 3057564, at *10 (D.D.C. July 8, 2014).  Alternatively, when a legal malpractice claim fails, a breach of contract claim that relies on the same underlying conduct as the malpractice claim, which Mrs. Rocha's original contract claim did, fails as well.  *See Macktal*, 111 F. Supp. 2d at 23 ("[I]f plaintiff is unable to prove his professional negligence claim, contract and tort claims which are essentially restatements of the failed malpractice claim must also fail."); *Biomet*, 967 A.2d at 669 n.4 ("*Biomet's* attempt to recast its malpractice argument as also breach of contract and breach of fiduciary duty fails.").

vary, add to, or subtract from the terms of a written contract must be excluded." *Affordable Elegance Travel, Inc. v. Worldspan, L.P.*, 774 A.2d 320, 327 (D.C. 2001) (quotation marks and alteration omitted); *see also Klayman v. Judicial Watch, Inc.*, No. CIV.A.06 670, 2007 WL 1034937, at *8 (D.D.C. Apr. 3, 2007) ("'[A] completely integrated contract may not be supplemented with prior representations not ultimately included therein, even if those representations are not expressly contradicted by the contract itself.'" (quoting *Hercules & Co. v. Shama Rest. Corp.*, 613 A.2d 916, 928 (D.C. 1992))).  Accordingly, under the rule, "'when the parties to a contract have reduced their entire agreement to a writing, the court will disregard and treat as legally inoperative parol evidence of the prior negotiations and oral agreements.'" *Klayman*, 2007 WL 1034937, at *8 (quoting *Hercules*, 613 A.2d at 928).

"'[W]hether an agreement is completely integrated is a preliminary question of fact for the trial court.'"  *Ghahremani v. Uptown Partners, LLC*, No. CIV.A. 05-1270, 2005 WL 3211463, at *9 (D.D.C. Nov. 13, 2005) (quoting *Howard Univ. v. Good Food Servs.*, 608 A.2d 116, 126 (D.C. 1992)).  A court's inquiry must focus on the "intent of the parties at the time they entered into the agreement," *Hercules*, 613 A.2d at 927, and that "investigation begins with an examination of the contract itself," *Klayman*, 2007 WL 1034937, at *8.  Thus, "if a document is facially unambiguous, its language should be relied upon as providing the best objective manifestation of the parties' intent." *Hercules*, 613 A.2d at 927 (quotation marks and alteration omitted).  Finally, "[a] presumption exists that a written contract contains all of the parties' terms, and the presence of an integration clause strengthens that presumption." *Johnson v. Reno*, Civ. No. 93-206, 1996 WL 33658687, at *5 (D.D.C. Apr. 17, 1996) (citing *Luther Williams, Jr., Inc. v. Johnson*, 229 A.2d 163, 165 (D.C. 1967)).

Here, the First Retainer contained an integration clause that stated: "I, the undersigned client, have read the above provisions and agree that they constitute the entire agreement between the parties."  First Retainer, Ex. 7.  Other than Brown's alleged oral promise, Mrs. Rocha offers no legal or factual extrinsic justification for why the Court should not accept the unambiguous language in this clause as conclusive evidence of the parties' intent to enter a completely integrated legal services contract.[24]  *See Hercules*, 613 A.2d at 928 n.17 ("[A] recital that the writing 'contains the entire agreement of the parties' has traditionally been given effect as showing an intention that the agreement be completely integrated[.]" (quotation marks omitted)).  Accordingly, the Court finds that the First Retainer was completely integrated, and the Court therefore "may not consider extrinsic evidence about the alleged prior oral agreement, since the subject of that agreement clearly falls 'within the scope' of the written agreement." *Bowden v. United States*, 106 F.3d 433, 440 (D.C. Cir. 1997) (quotation marks and alteration omitted); *see also One-O-One Enter., Inc. v. Caruso*, 848 F.2d 1283, 1287 (D.C. Cir. 1988) ("Were we to permit plaintiffs' use of the defendants' prior representations … to defeat the clear words and purpose of the Final Agreement's integration clause, contracts would not be worth the paper on which they are written….  [S]ilence in a final agreement containing an integration

---

[24]     Mrs. Rocha's only counterargument is that the integration question requires an evidentiary hearing.  *See* Pl.'s Reply Supp. Mot. Leave at 20-21.  But the sole case on which she relies does not support her position, *see Ozeral v. Howard Univ.*, 545 A.2d 638, 641 (D.C. 1988), and the Court finds no other basis for why this factual issue, like most others, cannot be decided at summary judgment if the situation warrants.  *Cf. Klayman*, 2007 WL 1034937, at *9 (finding, at summary judgment, that the contract was fully integrated and the parol evidence rule applied); *Nat'l R.R. Passenger Corp. v. Expresstrak, LLC*, No. CIV A 02-1773, 2006 WL 2947558, at *7 (D.D.C. Oct. 16, 2006) (denying summary judgment only after finding that there were "genuine issues of material fact as to whether the Sublease and Letter Agreement form a single integrated contract").

clause — in the face of prior explicit representations — must be deemed an abandonment or

excision of those earlier representations." (internal citations and quotations omitted)).

Further, to the extent that Mrs. Rocha still relies on a promissory estoppel theory, the

Court finds that such an argument fails for three reasons.  First, the Second Amended Complaint

makes no mention of promissory estoppel, nor does it specifically plead the elements required

for a promissory estoppel claim as to Brown's alleged oral promise.  *Cf. Ficken v. AMR Corp.*,

578 F. Supp. 2d 134, 145 (D.D.C. 2008) (under D.C. law, the elements of promissory estoppel

are "that (1) there was a promise, (2) the promise reasonably induced reliance on it, and (3) the

promisee relied on the promise to his or her detriment").  Second, "reliance on a promise cannot

be reasonable when it is completely at odds with the terms of a written agreement covering the

same transaction," as is the case with Brown's alleged legislative activity promise because that

promise clearly contradicts the scope of the First Retainer.  *Daisley v. Riggs Bank, N.A.*, 372 F.

Supp. 2d 61, 71 n.5 (D.D.C. 2005); *see also In re U.S. Office Prods. Co. Sec. Litig.*, 251 F. Supp.

2d 77, 97-98 (D.D.C. 2003) (explaining that reliance on an oral statement is unreasonable when

the statement contradicted the terms of, and was not incorporated into, the written agreement).

And third, promissory estoppel is available only in the absence of an express, enforceable

contract.  *See Ficken*, 578 F. Supp. 2d at 145; *see also Greggs v. Autism Speaks, Inc.*, 987 F.

Supp. 2d 51, 55 (D.D.C. 2014) ("Promissory estoppel … is not available in all circumstances:

District of Columbia law presupposes that an express, enforceable contract is absent when the

doctrine of promissory estoppel is applied." (quotation marks omitted)); *3D Global Solutions,*

*Inc. v. MVM, Inc.*, 552 F. Supp. 2d 1, 7 (D.D.C. 2008) ("District of Columbia law does recognize

a cause of action for promissory estoppel, although it does so only in the absence of an express,

enforceable contract.").  Here, there was an enforceable contract in the form of the First Retainer,

and the existence of this written contract prohibits Mrs. Rocha from relying on promissory estoppel for a prior, contradictory oral promise.  *See Int'l Bus. Mach. Corp. v. Medlantic Healthcare Grp.*, 708 F. Supp. 417, 424 (D.D.C. 1989) ("[C]ourts have … held that an integrated written contract controls as against any and all prior inconsistent oral agreements or promises; such a contract nullifies the effect that promissory estoppel might otherwise have.")

Without promissory estoppel, Mrs. Rocha's oral contract theory also fails due to a lack of separate consideration for Brown's alleged promise.  *See Henke v. U.S. Dep't of Commerce*, 83 F.3d 1445, 1450 (D.C. Cir. 1996) ("legal consideration" is an "essential element" of a valid contract).  Under D.C. law, an "'exchange of promises' or a 'detriment to the promisee' constitutes legally sufficient consideration, so long as it is bargained for."  *Wash. Inv. Partners of Del., LLC v. Sec. House*, *K.S.C.C.*, 28 A.3d 566, 574-75 (D.C. 2011) (quotation marks omitted). Here, Mrs. Rocha acknowledges that no consideration was provided in exchange for Brown's alleged promise to perform legislative activity that was separate from the consideration given for Defendants' services under the First Retainer, and thus no valid contract was formed.  *See* N. Rocha Dep. at 76:5-22 (testifying that there was "no separate payment" in exchange for Brown's alleged promise to change the law); Pl.'s Stmt. Facts in Dispute ¶ 101 (conceding that the "only consideration flowing between the parties arises out of and in connection with the services covered under the written agreement").  For the above reasons, the Court grants judgment for Defendants as to Mrs. Rocha's breach of an oral promise and promissory estoppel theories within Count III.

### 3.  Plaintiff's "Good Samaritan" Tort Liability Theory Fails

The only remaining potential theory of liability for Mrs. Rocha's legislative activity claim in Count III is her "Good Samaritan" duty argument.  On this point, Amato opined that

rather than an affirmative duty to achieve legislative change, Brown assumed a duty towards Mrs. Rocha by voluntarily undertaking to amend D.C. Code § 12-311 through his work with the DC-TLA.  *See, e.g.*, Amato Dep. at 207:16-21, 216:5-11, 217:10-15.  Defendants assert two arguments in response: first, Mrs. Rocha's "Good Samaritan" claim is time-barred; and second, under D.C. law, the "Good Samaritan" duty does not apply because Brown's legislative activity only posed a risk of economic harm to Mrs. Rocha, not physical harm.  The Court agrees with both arguments.

### a. The "Good Samaritan" Claim Is Time-Barred

Defendants first argue that Mrs. Rocha's "Good Samaritan" tort claim is time-barred.[25] Because the "Good Samaritan" duty involves a negligence tort claim, the District's three-year statute of limitations for negligence causes of action applies.  *See* D.C. Code § 12-301(8); *Sykes v. U.S. Attorney for D.C.*, 770 F. Supp. 2d 152, 155 (D.D.C. 2011); *Fed. Ins. Co. v. Thomas W. Perry, Inc.*, 634 F. Supp. 349, 353 (D.D.C. 1986).  "In ordinary negligence actions, a cause of

---

[25]       The B&G Defendants did not raise the statute of limitations argument until their reply memorandum in support of their motion for summary judgment and in opposition to Mrs. Rocha's motion for summary judgment.  *See* B&G Defs.' Reply Supp. Mot. Summ. J. at 9-11. Ordinarily, a party may not raise a new argument through a reply brief.  *See, e.g.*, *Performance Contracting, Inc. v. Rapid Response Const., Inc.*, 267 F.R.D. 422, 425 (D.D.C. 2010).  But under the facts here, the Court finds that, for three reasons, it is not "manifestly unfair" to Mrs. Rocha to consider this argument.  *See Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 195 (D.C. Cir. 1992) (consideration of arguments raised for the first time in a reply may be "manifestly unfair" to the respondent).  First, because Mrs. Rocha filed a cross-motion for summary judgment, she had an opportunity to file a reply brief in support of that motion, but she failed to do so for unknown reasons.  *Cf. Fischer v. FBI*, No. CIV.A.07-2037, 2008 WL 2248711, at *1 n.2 (D.D.C. May 29, 2008) (considering argument raised for the first time in defendant's reply brief because plaintiff immediately filed a sur-reply in opposition).  Second, Defendants extensively briefed similar statute of limitations issues in regard to the legal malpractice claim, so Mrs. Rocha was on notice that limitations issues were in play for her tort theories.  And third, the alleged legal basis for Mrs. Rocha's "Good Samaritan" claim was not explained in detail until her cross-motion, thus making it difficult for Defendants to comprehend the scope of her claim prior to that point, which may explain why Defendants failed to raise the limitations defense earlier.

action accrues for statute of limitations purposes at the time the injury actually occurs."[26] *Knight v. Furlow*, 553 A.2d 1232, 1234 (D.C. 1989); *see also Capitol Place I Assocs. LP v. George Hyman Constr. Co.*, 673 A.2d 194, 198 (D.C. 1996) ("In negligence actions, accrual usually occurs upon the date that injury results from the negligence.").

Assuming *arguendo* that Mrs. Rocha presents a cognizable "Good Samaritan" negligence claim, the Court finds that the limitations period for that claim began accruing no later than when the D.C. Superior Court issued the Omnibus Order on January 10, 2011.  In that order, the D.C. court explicitly ruled that the D.C. Council's emergency resolution and emergency act were insufficient to render timely Mrs. Rocha's underlying asbestos-related lawsuit.  At that point, Brown's alleged failure to achieve the necessary legislative change became evident, and the injury to Mrs. Rocha, in the form of the Superior Court dismissing her D.C. lawsuit as time-barred, occurred.  Accordingly, because Mrs. Rocha's June 9, 2014, complaint was filed more than three years after January 10, 2011, her "Good Samaritan" tort claim is time-barred.

### b.  The "Good Samaritan" Claim Fails On The Merits

Alternatively, Mrs. Rocha's "Good Samaritan" claim also fails on the merits under D.C. law.  *Cf. Metz*, 774 F.3d at 21-22 (the Court's task when sitting in diversity is "to achieve the same outcome [that] would result if the District of Columbia Court of Appeals considered this case" (quotation marks omitted)).  Defendants do not dispute that D.C. courts recognize the "Good Samaritan" duty.  Instead, Defendants argue that the scope of this duty under D.C. law

---

[26]     Mrs. Rocha attempts to bring the "Good Samaritan" duty tort claim separate and distinct from her failed legal malpractice tort claim.  Because the "Good Samaritan" duty relates only to an ordinary negligence action, not a legal malpractice action, there is no basis for applying the continuous representation rule to toll the limitations period here.  Indeed, under the "Good Samaritan" duty, there is no "legal representation" to continue, but rather only the duty allegedly created by the voluntary undertaking.

extends only to volunteer actions that result in, or create an increased risk of, physical harm to

the plaintiff or her property. *See* B&G Defs.' Mem. Supp. Mot. Quash Subpoena, ECF No. 33,

at 4-5. As such, Defendants move for summary judgment on the basis that the "Good

Samaritan" duty does not apply to Brown's legislative activity, which involved only economic

harm to Mrs. Rocha. *See id.*; *see also* B&G Defs.' Mem. Supp. Mot. Summ. J. at 47. Mrs.

Rocha, on the other hand, contends that D.C. courts have, in fact, applied the "Good Samaritan"

duty to cases that involve only economic loss. *See* Pl.'s Mem. Supp. Mot. Summ. J at 38.

The Court's review of the cases applying the "Good Samaritan" duty under D.C. law

reveals that the scope of this duty in the District is firmly rooted in the Restatement (Second) of

Torts. In particular, in *Haynesworth v. D.H. Stevens Co.*, 645 A.2d 1095 (D.C. 1994), the D.C.

Court of Appeals cited § 323 of the Restatement as the authoritative definition for the duty:

> **§ 323. Performance of Undertaking to Render Services**: One who undertakes,
> gratuitously or for consideration, to render services to another which he should
> recognize as necessary for the protection of the other's person or things, is subject
> to liability to the other for physical harm resulting from his failure to exercise
> reasonable care to perform his undertaking, if (a) his failure to exercise such care
> increases the risk of such harm, or (b) the harm is suffered because of the other's
> reliance upon the undertaking.

Restatement (Second) of Torts § 323 (quoted by *Haynesworth*, 645 A.2d at 1097). The D.C.

court in *Haynesworth* thus explained that "[a]lthough the Restatement has not been formally

adopted by this court, it is clear that the particular concept [in § 323] is well known and has been

readily applied, where appropriate." *Id.* (citing *Long v. District of Columbia*, 820 F.2d 409, 419

(D.C. Cir. 1987)).

Like *Haynesworth*, other cases considering the "Good Samaritan" duty under D.C. law

consistently have begun their analysis by citing the definition in § 323. *See Hornbeck Offshore*

*Transp., LLC v. United States*, 569 F.3d 506, 511 (D.C. Cir. 2009) (applying D.C. law and citing

§ 323 as the basis for the "Good Samaritan" doctrine); *Serv. Emps. Int'l Union Health & Welfare*

*Fund v. Philip Morris, Inc.*, 83 F. Supp. 2d 70, 92 (D.D.C. 1999) (same); *Andrews v. Wilkins*,

No. CIV. A. 88-1326, 1990 WL 102777, at *6 (D.D.C. July 11, 1990) (same); *see also Thomas*

*W. Perry*, 634 F. Supp. at 353 ("[T]he basic principle of Restatement, § 323, has, it appears,

likewise been adopted as the law of the District of Columbia." (citing *Remeikis v. Boss & Phelps,*

*Inc.*, 419 A.2d 986, 991 (D.C. 1980); *Arnold's Hofbrau, Inc. v. George Hyman Constr. Co., Inc.*,

480 F.2d 1145, 1148 (D.C. Cir. 1973))).  Given this clear and unwavering line of cases, the Court

rejects Mrs. Rocha's bald assertion that D.C. courts have "never adopted § 323[.]"  Pl.'s Mem.

Supp. Mot. Summ. J. at 41.

      The Court therefore also rejects as inapposite the cases on which Mrs. Rocha relies that

plainly did not involve the "Good Samaritan" duty and did not cite § 323.  For example, Mrs.

Rocha cites *Hedgepeth v. Whitman Walker Clinic*, 22 A.3d 789 (D.C. 2011), where the plaintiff

alleged that he suffered emotional distress after a doctor negligently informed him that he was

HIV positive when he was not.  *See id*. at 792.  In the context of the plaintiff's *negligent*

*infliction of emotional distress* claim, and without mentioning the "Good Samaritan" duty, the

D.C. court adopted a "limited" rule to supplement the zone of physical danger test for the

negligent infliction tort when a "defendant has an obligation to care for the plaintiff's emotional

well-being or the plaintiff's emotional well-being is necessarily implicated by the nature of the

defendant's undertaking."  *Id*.  *Hedgepeth* says nothing about the "Good Samaritan" duty.

      A similar error befalls Mrs. Rocha's reliance on *Security National Bank v. Lish*, 311 A.2d

833 (D.C. 1973).  *See* Pl.'s Mem. Supp. Mot. Summ. J. at 40-41.  In *Lish*, the defendant-attorney

negligently provided false information to a bank in regard to the status of a second trust being

used as security for a loan the bank made to the lawyer's client.  *See Lish*, 311 A.2d at 834.  The

bank then sued the attorney for losses sustained from the loan.  *See id*.  On appeal from the trial

court's granting of summary judgment to the attorney, the D.C. Court of Appeals explained that "in appropriate circumstances, an attorney is not exempt from the general principle that 'one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all.'" *Id.* (citation omitted).  The court continued that "[o]ne engaged in supplying information has a duty to exercise reasonable care," and "[w]here information is supplied directly to a third party (or indirectly for the benefit of a specific third party), then the same duty of reasonable care exists, notwithstanding a lack of privity." *Id.* at 834-35.  In making this statement, the court cited Restatement of Torts § 552, which relates to the negligent misrepresentation of information in a business capacity.  *See id.* at 835.  But here, Mrs. Rocha does not present a claim for negligent misrepresentation under § 552, nor does she offer any allegations that Brown negligently provided false or misleading information to the D.C. Council or another third party.  *Lish* is legally and factually inapposite.

Mrs. Rocha likewise mislabels as a "voluntarily undertaking doctrine" case the decision in *Burlington Insurance Co. v. Okie Dokie, Inc.*, 329 F. Supp. 2d 45 (D.D.C. 2004).  *See* Pl.'s Mem. Supp. Mot. Summ. J. at 40.  *Burlington*, which cites *Lish*, involved false statements made by an applicant to an insurance company in an insurance application, and the case dealt with a *negligent misrepresentation* claim under § 552 of the Restatement (Second) of Torts, not the "Good Samaritan" duty under § 323.  *See Burlington*, 329 F. Supp. 2d at 48-49.  Mrs. Rocha's reliance on *Georgetown College v. Hughes*, 130 F.2d 810 (D.C. Cir. 1942), fails for a similar reason, as that case addressed "whether a charitable corporation is liable for injury negligently caused by an employee acting in the course of duty." *Id.* at 810.  *Hughes* thus was, at base, a charitable immunity case, not a "Good Samaritan" duty case.

Mrs. Rocha also relies on *Arnold's Hofbrau, Inc. v. George Hyman Construction Co.*, 480 F.2d 1145 (D.C. Cir. 1973), but nothing in that case supports her position that the "Good Samaritan" duty extends to economic harm under D.C. law.  There, the plaintiff operated a restaurant that was damaged during construction by the defendants on an adjacent property.  *See id*. at 1146.  The plaintiff then relied on the defendants' promise to fix the damage, but the defendants were negligent in making the repairs.  *See id*. at 1147-48.  On appeal, the D.C. Circuit found that liability could be established against the defendants through a voluntary undertaking duty in accordance with § 323, as well as through promissory estoppel.  *See id*. at 1148.  Mrs. Rocha now suggests that *Arnold's Hofbrau* supports her claim because "[t]he court ruled that plaintiffs were not limited solely to physical injury and that Defendants were liable as well for economic damages."  Pl.'s Mem. Supp. Mot. Summ. J. at 40.  But the type of *damages* recovered is distinct from the type of *harm* created by the defendants' negligence (especially when that recovery also was based on promissory estoppel), and § 323 concerns itself only with the initial harm question.  In fact, though not explicitly discussed by the court, *Arnold's Hofbrau*'s voluntary duty analysis was fully consistent with § 323 because the defendants' negligence created a risk of *physical harm* to the plaintiff and his property (*i.e.*, the restaurant).[27]  *See* Restatement (Second) of Torts § 7(3) (defining "physical harm" as "the physical impairment of the human body, or of land or chattels").

---

[27]     Mrs. Rocha's attempt to rely on *Gerace v. Liberty Mutual Insurance Co.*, 264 F. Supp. 95 (D.D.C. 1966), also fails.  *Gerace* held that the voluntary undertaking duty did not apply when "the insurance carrier did not undertake to perform a voluntary act for the benefit of someone else," but rather the provision in the insurance contract that permitted the insurer's inspection of a jobsite was for the insurers benefit only.  *See id*. at 97.  This case says nothing about Mrs. Rocha's economic harm argument.

Lastly, the Court is not persuaded by Mrs. Rocha's reliance on a footnote in *In re Sabin Oral Polio Vaccine Products Liability Litigation*, 774 F. Supp. 952 (D. Md. 1991).  In *Sabin*, the Maryland federal district court justified its citation to § 324A of the Restatement (Second) of Torts for the definition of the "Good Samaritan" duty by clarifying language in an earlier Maryland state court opinion.[28]  Specifically, the *Sabin* court explained that

> *Chew v. Meyer*, [527 A.2d 828 (1987),] is not to the contrary because although *Chew* made the flat statement that '§ 323 is not the law of Maryland,'… the court was holding only that Maryland law goes further than [§ 323] and subjects tortfeasors to liability, under certain circumstances, for economic loss as well as physical injury.

*In re Sabin*, 774 F. Supp. at 955 n.6.  *Chew* therefore involved the Maryland court explicitly refusing to follow § 323, and it was only after rejecting the Restatement's definition that the Maryland court expanded the duty to include economic harm.  *See Chew*, 527 A.2d at 831.  In so holding, *Chew* actually recognized *sub silentio* that if it were to follow § 323, the plaintiff's claim would have failed because the Restatement requires physical harm.  *Sabin* itself, moreover, did not involve economic harm, but rather an alleged violation of certain polio vaccine regulations that "increased the risk of" *physical harm* to the plaintiffs.  *Sabin*, 774 F. Supp. at 953-55.

But regardless of the analysis in *Sabin* and *Chew*, the D.C. Court of Appeals has explained that Maryland common law is "the source of the District's common law and an especially persuasive authority *when the District's common law is silent*."  *Napoleon v. Heard*, 455 A.2d 901, 903 (D.C. 1983) (emphasis added); *see also Interstate Fire & Cas. Co. v. Wash. Hosp. Ctr. Corp.*, 758 F.3d 378, 383 (D.C. Cir. 2014) ("When local law is silent, the common

---

[28]     Section 324A deals with liability to a third person for negligent performance of a voluntary undertaking.  It includes the same "physical harm" language as § 323.

law of Maryland is especially persuasive authority, as Maryland law is historically the source of the District's common law." (quotation marks omitted)).  The Court therefore declines Mrs. Rocha's request to look towards foreign law because D.C. courts *have* spoken on the "Good Samaritan" duty by repeatedly holding that § 323 provides the pertinent definition.

Returning to that D.C. law, in *Service Employees International Union Health & Welfare Fund v. Philip Morris, Inc.*, 83 F. Supp. 2d 70 (D.D.C. 1999), this Court addressed an issue nearly identical to that raised by Mrs. Rocha today.[29]  The plaintiffs there alleged that despite the defendant-tobacco companies' "express public promise to assume the responsibility to discover and disclose information about tobacco use, they intentionally and recklessly misrepresented and concealed such information." *Id*. at 78.  In analyzing the "Good Samaritan" claim, the Court emphasized the "physical harm" language in § 323 and noted that § 7(3) of the Restatement defines "physical harm" as "the physical impairment of the human body, or of land or chattels." *See id*. at 92-93.  Based on the plain language of § 323, the Court rejected the plaintiffs' argument that "the special duty torts have been extended to encompass economic harm" under D.C. law, *id*. at 92 n.36, and the Court therefore dismissed the "Good Samaritan" duty claim because the plaintiffs had "not alleged any physical harm." *Id*. at 92.

Consistent with *Philip Morris* and without any D.C. cases to the contrary, this Court finds no grounds for departing from § 323, which, as recognized in *Haynesworth* and elsewhere, clearly provides that a defendant is subject to liability only when his failure to exercise reasonable care either increased the risk of physical harm to the plaintiff or caused the plaintiff to

---

[29]     On appeal in *Philip Morris*, the D.C. Circuit affirmed in part and reversed in part, but the plaintiffs did not appeal the district court's holding as to § 323. *See* 249 F.3d 1068, 1070 (D.C. Cir. 2001) ("The funds … appeal the dismissal of all of their other claims save for their special duty and indemnity claims.").

suffer actual physical harm.[30]  *See* Restatement (Second) of Torts § 323.  Here, not only is it

undisputed that Mrs. Rocha's legislative activity claim does not implicate any actual or potential

---

[30]     D.C. law on this issue is fully consistent with the substantial majority of courts that have considered a similar question under § 323 and held that the "Good Samaritan" duty does not permit recovery when only economic harm is alleged.  *See, e.g.*, *Shaner v. United States*, 976 F.2d 990, 994 (6th Cir. 1992) (citing § 323, denying recovery under Ohio law, and holding that the "Good Samaritan Doctrine is limited to physical harm"); *Love v. United States*, 915 F.2d 1242, 1248 (9th Cir. 1989) (applying Montana law and affirming dismissal of a claim based only on economic loss because § 323 requires physical harm); *Platinum Cmty. Bank v. Marshall Invs. Corp.*, No. 06 C 3544, 2008 WL 4866343, at *7 (N.D. Ill. July 29, 2008) (citing § 323 and explaining that "[t]his court has not found, nor has [plaintiff] cited, any cases in which the voluntary undertaking doctrine has been applied to claims alleging economic harm"); *Safari Aviation, Inc. v. United States*, No. CIV 07-00078, 2008 WL 1960145, at *3 (D. Haw. May 2, 2008) (citing § 323, applying Alaska law, and rejecting plaintiff's claim because "[t]he Court has not found a single case in Alaska where the Good Samaritan doctrine was applied to an economic injury"); *United HealthCare Ins. Co. v. AdvancePCS*, No. CIV.01-2320, 2003 WL 22316555, at *4 (D. Minn. Oct. 6, 2003) (applying Minnesota law and finding that the "plain text" of § 323 excludes recovery for economic loss); *Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris Inc.*, 79 F. Supp. 2d 1219, 1228 (W.D. Wash. 1999) (citing § 323 and denying claim because the duty requires "physical harm"); *Or. Laborers-Empl'rs Health & Welfare Trust Fund v. Philip Morris, Inc.*, 17 F. Supp. 2d 1170, 1182 (D. Or. 1998) (dismissing claim that defendant breached voluntary duty because "physical harm" is "a necessary element under [§] 323"); *Hatleberg v. Norwest Bank Wisc.*, 700 N.W.2d 15, 24 (Wisc. 2005) ("Despite the voluminous number of cases applying [§ 323] of the Restatement, we have found no cases … holding that purely economic harm satisfies the 'physical harm' requirement."); *Theisen v. Covenant Med. Ctr., Inc.*, 636 N.W.2d 74, 82 (Iowa 2001) (denying claim of wrongful discharge based on negligent investigation into employee misconduct because plaintiff suffered no physical harm, as § 323 requires); *Long v. Niles Co., Inc.*, 2010 Mass. App. Div. 43 (Mass. Dist. Ct. 2010) (citing § 323 and holding that because "the harm suffered by the [plaintiff], a gap in insurance coverage, was not physical, it was not the type of harm for which recovery may be had under a theory of breach of a voluntarily assumed duty"); *Carlotti v. Emps. of Gen. Elec. Fed. Credit Union No. 1161*, 717 A.2d 564, 567 (Pa. Super. Ct. 1998) ("We have been unable to find any binding decision that would impose a duty under § 323 where the harm alleged is merely financial."); *Felton v. Schaeffer*, 229 Cal. App. 3d 229, 238 (Cal. Ct. App. 1991) (denying claim under § 323 because doctor's negligence caused no physical injury to patient).  Indeed, the few courts that have allowed recovery for economic harm under § 323 have done so without any explanation for departing from the plain language of the Restatement.  *See, e.g.*, *Lloyd v. State Farm Mut. Auto. Ins. Co.*, 860 P.2d 1300, 1303 (Ariz. Ct. App. 1992) (quoting § 323 and holding, without explanation, that a "volunteer may be liable for economic harm as well as physical harm"); *Blackmon v. Nelson, Hesse, Cyril, Weber & Sparrow*, 419 So.2d 405, 406 (Fla. Dist. Ct. App. 1982) (citing § 323 but applying the voluntary duty to an economic loss claim without explanation for this departure).

physical harm to her person or property, but also Brown's legislative activity did not "increase the risk" of any type of harm to her, whether physical or economic.[31]

Specifically, Mrs. Rocha alleges that absent Brown successfully getting D.C. Code § 12-311 amended to include an alternative three-year limitations period and a retroactivity clause, her claims were time-barred in D.C.  *See, e.g.*, 2d Am. Compl. ¶ 3 ("Brown drafted legislation to effect the change [to § 12-311] but failed … thereby dooming Plaintiff's [D.C.] action to dismissal by summary judgment on limitations grounds.").  But assuming that the D.C. Superior Court was correct in dismissing Mrs. Rocha's claims under D.C. Code § 12-311, Mrs. Rocha found herself in exactly the same position (*i.e.*, with time-barred D.C. claims) after the Superior Court considered the D.C. Council's emergency legislative efforts as she would have been had Brown never contacted the DC-TLA.  In other words, Brown's legislative activities did not worsen or increase the risk of harm to Mrs. Rocha's legal position, but rather Brown's alleged failure to obtain change simply left Mrs. Rocha in the same condition as she was before his involvement, which is insufficient under § 323.  *See Myers v. United States*, 17 F.3d 890, 903 (6th Cir. 1994) ("The test [under § 324A(a)] is not whether the risk was increased over what it would have been if the defendant had not been negligent.  Rather, a duty is imposed only if the risk is increased over what it would have been had the defendant not engaged in the undertaking at all."); *Turbe v. Gov't of Virgin Islands*, 938 F.2d 427, 432 (3d Cir. 1991) ("[Section] 323(a) applies only when the defendant's actions increased the risk of harm to the plaintiff relative to

---

[31]     The B&G Defendants did not elaborate on the "increased risk of harm" argument until their reply memorandum in support of their motion for summary judgment and in opposition to Mrs. Rocha's motion for summary judgment.  *See* B&G Defs.' Reply Supp. Mot. Summ. J. at 19-21.  The B&G Defendants have, however, consistently relied on § 323 for their defense to the "Good Samaritan" claim dating back to their opposition to the Figueras subpoena, *see* ECF No. 33, so the Court finds that Mrs. Rocha was on notice about this issue.  Further, Mrs. Rocha could have, but did not, file a reply to the B&G Defendants' opposition.

the risk that would have existed had the defendant never provided the services initially.  Put another way, the defendant's negligent performance must somehow put the plaintiff in a worse situation than if the defendant had never begun the performance."); *see also* Restatement (Second) of Torts § 323 cmt. (c) ("The actor may normally abandon his [voluntary] efforts at any time unless, by giving the aid, he has put the other in a worse position than he was in before the actor attempted to aid him.").

Accordingly, the Court concludes that the "Good Samaritan" doctrine does not impose a legal duty on Brown under the facts of this case.  *Cf. Hedgepeth*, 22 A.3d at 806 (a "duty of care" is a necessary element for a negligence claim).  The Court therefore grants judgment for Defendants as to Count III because Mrs. Rocha fails to state any cognizable claim for relief.[32]

### 4.  Lipman's Motion For Summary Judgment As To Count III

Lipman filed a separate motion seeking judgment in his favor as to Count III on the grounds that he did not owe Mrs. Rocha a contract or tort duty to perform legislative activity. *See* Lipman's Mem. Supp. Mot. Summ. J. at 4.  In support, Lipman asserts that he was not present when Brown made the alleged legislative activity promise to Mrs. Rocha, and he also did not engage in, nor promise to engage in, such activity for her at a later time.  *See id*. at 4-5; *see also* Lipman Stmt. Facts ¶¶ 2, 4.  In addition, Lipman asserts, and Mrs. Rocha does not dispute, that Amato's testimony about the "Good Samaritan" duty only discussed Brown and did not opine on a duty owed by Lipman to Mrs. Rocha.  *See* Lipman's Mem. Supp. Mot. Summ. J. at 5.

---

[32]      In their motion to strike, the B&G Defendants challenge the propriety of Amato's opinion that Brown's representation breached the standard of care by failing to get a retroactivity provision included in D.C. Code § 12-311.  *See* B&G Defs.' Mot. to Strike at 3.  Because the Court finds that no duty existed, the Court need not address Amato's testimony, and thus the Court denies the motion to strike as moot.

Mrs. Rocha responds by suggesting that "Lipman's motion merely adopts [the B&G Defendants'] motion for summary judgment and offers no other grounds entitling [him] to summary relief." Pl.'s Mem. Supp. Mot. Summ. J. at 12 n.1.  Not so.  Though Lipman does not dispute that he would be jointly liable with the B&G Defendants under the First Retainer, *see* Lipman Dep. at 7:1-10, Mrs. Rocha's theory in Count III is separate from the representation under the retainer.  By ignoring Lipman's arguments about his lack of liability on any Count III theory, as well as Lipman's statement of facts in support of those arguments, Mrs. Rocha concedes that Lipman is not liable on the legislative activity claim.  *See COMPTEL*, 945 F. Supp. 2d at 55; *Hopkins*, 284 F. Supp. 2d at 25.  Accordingly, the Court may grant judgment for Lipman as to Count III on this separate basis.

## V.  CONCLUSION

For the foregoing reasons, the Court **grants** the B&G Defendants' and Lipman's motions for summary judgment, and the Court **denies** Mrs. Rocha's motion for summary judgment.  The Court also **denies as moot** the B&G Defendants' motion to dismiss the Second Amended Complaint and motion to strike Amato's expert opinions.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  April 30, 2015                                      RUDOLPH CONTRERAS
                                                                    United States District Judge